Robert W. KELLEY et al., Appellants and Cross-Appellees,

v.

BOARD OF EDUCATION OF The CITY OF NASHVILLE, DAVIDSON COUNTY, TENNESSEE, et al., Appellees and Cross-Appellants.

Nos. 13748, 13749.

United States Court of Appeals Sixth Circuit.

June 17, 1959.

Z. Alexander Looby and Avon N. Williams, Jr., Nashville, Tenn. (Thurgood Marshall, New York City, on the brief), for appellants and cross-appellees.

Edwin F. Hunt and Reber Boult, Nashville, Tenn. (Howard, Davis, Boult & Hunt, Fred Elledge, Jr., U. S. Atty., Nashville, Tenn., George McCanless, Atty. Gen. of Tenn., on the brief), for appellees and cross-appellants.

Gerald B. Tjoflat, Cincinnati, Ohio, amicus curiae.

Before ALLEN and McALLISTER, Circuit Judges, and CHOATE, District Judge.

McALLISTER, Circuit Judge.

This is an appeal from the judgment of the district court approving a plan of the Board of Education of the City of Nashville, Tennessee, providing for desegregation of the public schools of that city, commencing with the first grade, and proceeding by the desegregation of one additional grade a year until all grades in all public schools have been finally desegregated.

The background of the case is pertinent: The entry of the judgment approving the above plan of desegregating the first grade and compliance therewith by the Board of Education and the school authorities gave rise to violence on the part of criminal elements opposed to desegregation, who wrecked a city school by bombing, and destroyed a synagogue by the same means. Unlawful crowds of disorderly persons caused great trouble and turbulence until the district court restrained one Kasper and others, by injunction, from acts of violence, intimidation, coercion, and incitement. In granting the injunction, the district court declared that the action of the Board of Education in putting into effect the order and judgment of the court "precipitated a situation in the City of Nashville which very nearly approached for some several hours' time—if not for several days' time—a reign of terror, certainly a reign of terror among those parents having children in the public schools, particularly in the first grade schools. * * * [If] it had not been for the decisive way that the City authorities went about discharging their duties, the reign of terror which overwhelmed the City would have been much worse than it actually was." It was the Board of Education of the City of Nashville that, when the trouble started, immediately pressed for the injunction against the acts of violence and coercion; and it was the police of the City of Nashville that curbed the acts of intimidation and enforced public order. It is to be remarked that none of the illegal acts, riotous conduct, or inflammatory propaganda hampered either the district judge or the Board of Education in carrying out their duties, firmly and swiftly, in the face of terroristic threats and disorder that characterize such unlawful groups in every part of the country where riots, arising from any cause, have, in the past, occurred.

Plaintiff-appellants are Negro children who attend public schools in Nashville, Tennessee, and their parents. On September 23, 1955, on behalf of themselves and others in like position, they filed

their complaint in the district court against defendant-appellees, the Board of Education of the City of Nashville, and its members, the Superintendent of Schools for Nashville, and several public school principals. In their complaint, appellants asked for a judgment declaring that the laws of Tennessee, requiring segregation of white and Negro children in the schools, were unconstitutional; and they prayed for an injunction restraining appellees from refusing to admit such Negro children to specified schools, solely because of their race. The complaint was subsequently amended to add, as party plaintiffs, two white children (and their parents) who had been denied admission to schools theretofore operated on a segregated basis for Negroes.

To this complaint, appellees filed answer, admitting that they had denied appellant school children admission to the public schools closest to their homes, to which they had applied, solely on the basis of race; but appellees conceded that the segregation laws of Tennessee must, necessarily, yield to the principles declared by the Supreme Court in the so-called School Segregation Cases. Appellees, accordingly, set forth that they intended in good faith to implement the decisions of the Supreme Court; that an Instruction Committee had been appointed by the Board of Education for the purpose of studying the situation; that two comprehensive surveys had been carried out, and two progress reports filed; and that appellees needed more time to formulate a plan for desegregation in the public schools.

Because of the nature of the relief sought in the complaint, asking that the laws of Tennessee requiring school segregation be declared unconstitutional, the case came on for hearing before a three-judge court.

On the hearing before the three-judge court, it appeared that the Board of Education of the City of Nashville had proceeded to investigate and take action after the decision of the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, which had enunciated the principles that should govern the district courts in formulating decrees to implement its ruling that racial segregation in public schools is unconstitutional. Immediately after the determination in the above case, the Board of Education began an extensive study to determine the methods to be followed in the school system of the City of Nashville to effectuate the constitutional principles declared by the Supreme Court. These studies included investigation of the programs of other cities in the matter of desegregation, an analysis and review of pertinent books and periodicals, attendance by its representatives at work shops and other group meetings, and the exchange of views between its members and others invited to meet with its Committee.

From one of several opinions filed by the district court during the course of these proceedings on different aspects of the case, it appeared that, from the outset, the Board of Education frankly and openly recognized its obligation to maintain the school system upon a racial nondiscriminatory basis, and that it had endeavored, by its careful investigation and study of the question, to find a solution which would accomplish the transition as soon as reasonably practicable consistent with the public interest and the efficient operation of the schools. As the court remarked: "The problem confronting the Board of Education was not one which was concerned with a single school but with an entire school system which had been maintained for practically a hundred years—always on a segregated basis, and having an aggregate school population of 27,000 students, of whom 10,000 were Negro students. In this situation the Board concluded that it would need more time to formulate a workable plan of integration."

Such was the aspect of the case before the three-judge court on the complaint for a judgment to declare the Tennessee laws requiring segregation of school children to be in violation of the Federal Constitution. In view, however, of ap-

pellees' concessions that the above mentioned Tennessee segregation laws were unconstitutional, and in recognition of their request for further time to formulate a plan of desegregation, a continuance was granted, and, after remanding the case to the district court, an order was entered dissolving the three-judge court.

At the October, 1956, term of the district court, the case was called. Apparently there had been widespread discussion about new laws that might be adopted by the state legislature, and, accordingly, appellees moved for a postponement on the assumption that the 1957 Tennessee legislature might enact statutes relevant to the case. The district court, however, denied such motion for a postponement.

On November 13, 1956, appellees submitted to the district court a plan embodying the following provisions: abolition of compulsory segregation in Grade One of the elementary schools beginning September, 1957; the establishment of a zoning system for Grade One, based on residence, and without reference to race; the establishment of a transfer system allowing the transfer of white and Negro students who would otherwise be required to attend schools previously serving only members of the other race, and allowing the transfer of any student from a school where the majority of the students were of a different race; fixing December 31, 1957, as the date for a further recommendation by the Board of Education's Instruction Committee as to the time and number of grades to be included in the next step to abolish segregation.

After a hearing, the district court held that the plan presented by appellees was inadequate, inasmuch as it did not submit a complete plan to abolish segregation in the public schools; and the Board of Education was, therefore, required to present, by December 31, 1957, a report setting forth a plan to abolish segregation in the remaining grades of the city school system, including a time schedule. The district court retained jurisdiction

of the case and withheld the issuance of the injunction prayed for in the complaint, pending the filing of the new plan.

On January 9, 1957, the Governor of Tennessee appeared before a joint session of the General Assembly to propose five bills permitting local authorities to act with respect to questions of racial integration in the public schools.

On January 25, 1957, the bills proposed by the Governor were finally approved by the General Assembly, and, as enacted, included: (1) legislation authorizing the establishment of separate schools for pupils whose parents or guardians voluntarily elected that they attend schools only with members of their own race, generally referred to as the School Preference Law; (2) a Pupil Assignment Act to provide for the assignment of pupils to public schools by county or city boards of education; (3) an amendment to the then existing law, authorizing the transfer of pupils between school systems; (4) authorization for the joint operation of school facilities; and (5) an amendatory bill dealing with transportation of pupils.

On August 30, 1957, the Board of Education filed a motion for leave to file a supplemental answer and counterclaim, alleging that Chapter 11, Public Acts of Tennessee for 1957, authorized the establishment of separate schools for white and Negro children whose parents elect that such children attend schools with members of their own race; and that petitions had been received from parents urging the establishment of such separate schools, and seeking a declaration of its right to operate separate schools in the light of the prior judgment of the court. After the hearing of arguments on appellees' motion to file a supplemental answer and counter-claim, the district court ruled that the state statute in question was unconstitutional and denied the motion of the Board of Education to file its supplemental answer and counter-claim.

On December 6, 1957, the Board of Education filed with the district court what was termed a complete plan to

abolish segregation in all grades of the city school system, which contemplated the establishment of a system substantially the same as that authorized by the provision of the state statute which the district court had previously ruled was unconstitutional. By the terms of this plan, an annual census was to be conducted to determine which parents desired their children to attend schools with members of their own race exclusively, and which parents desired that their children attend schools with members of another race. On the basis of this poll, three types of schools were to be operated: schools for Negro children whose parents preferred that their children attend segregated schools; schools for white students whose parents preferred that their children attend segregated schools; and schools for students whose parents preferred that they attend integrated schools.

On January 20, 1958, the Board of Education filed a motion to dismiss the case on the ground that the Tennessee Pupil Assignment Act, Chapter 13, Public Acts of 1957, which was approved a year earlier, provided an adequate administrative remedy which must be exhausted before the rights of appellants to transfer to different schools could be judicially determined. After a hearing in open court on January 28, 1958, the district court, on February 18, 1958, denied the motion to dismiss, stating that the Board of Education was committed to a policy of continuance of compulsory segregation, and that the remedy provided by the Pupil Assignment Act was not adequate. The court further disapproved the plan of the Board of Education filed on December 6, 1957, holding that, like Chapter 11, it failed to meet the test of constitutionality because it would give the sanction of law to a continuation of compulsory segregation in public education. The district court, however, continued to withhold the issuance of an injunction and allowed the Board additional time until April 7, 1958, to file another plan to eliminate racial discrimination in its school system.

On April 7, 1958, the Board of Education filed with the district court a plan for the abolition of compulsory segregation in Grade Two in September, 1958, and in one additional grade a year thereafter, until segregation had been entirely abolished in all primary, secondary, junior high school, and senior high school grades, retaining the zoning and transfer provisions contained in the plan, as theretofore approved by the court.

After a hearing, the district court, on June 19, 1958, filed an opinion approving the Board's plan. On July 17, 1958, findings of fact and conclusions of law were entered by the district court, in accordance with its opinion, and a judgment was entered in which the final plan of the Board of Education was approved in its entirety and appellants' prayer for injunctive relief was denied. The district court furthermore retained jurisdiction of the case during the entire period of transition.

It is contended by appellants that the district court erred in its judgment in that the plan for desegregation of all the grades of all of the public schools of Nashville, as approved by the district court, violates the Constitution, as declared by the Supreme Court, for the following reasons:

(a) That the plan of the Board of Education, instead of providing for immediate desegregation of all grades of all public schools—which it is claimed by appellants is required by law—extended over too long a period, and did not comply with the direction of the Supreme Court that a district court require a prompt and reasonable start toward integration, and that it take such action as is necessary to bring about the end of segregation in the public schools with all deliberate speed.

(b) That the plan permitting every student, within its provisions, to attend the school designated for the geographic zone of his residence, and, at the same time, permitting the parents of such

student to apply for his transfer, where he is one of a racial minority in his zone —or would be required by the zoning to attend a school which previously served only students of the other race—is a deprivation of such child's constitutional rights.

On the other hand, it is contended by the Board of Education and the other appellees and cross-appellants, that the district court erred in holding that the Fourteenth Amendment was violated by a plan based on a statute of the State of Tennessee, enacted after this controversy arose, in which local school boards were authorized to provide separate segregated schools for both white and Negro children whose parents voluntarily elected that their children attend such segregated schools with members of their own race.

 Full implementation of the constitutional principles involved in this case "require[s] solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems * * *." Brown v. Board of Education, 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083. Therefore, a consideration of the school problems confronted by the Board of Education of the City of Nashville, and the solution arrived at by the Board, is necessary to a determination of the controversy before us.

As above mentioned, at the time of the hearing in the district court, the aggregate public school population of Nashville was 27,000 students, of whom 10,000 were Negro students. There were 38 primary and elementary schools, and 8 senior high schools. Thirteen of the primary and elementary schools are operated for Negro students. Two of the eight senior high schools are operated for Negro students. The Nashville schools employ 1,057 principals and teachers, of whom 702 are white teachers, and 355 are Negro teachers. First grade teachers number 115, of whom 73 are white, and 42 are Negro teachers. There is no difference in the salary schedules of Negro teachers and white

teachers; and, insofar as physical facilities are concerned, the public schools of Nashville operated for Negro students are substantially equal to those operated for white students.

If an order for total desegregation were entered by the court, every one of the public schools in the city would be affected, although, as to some of the schools, there would probably be one Negro child—or only a few Negro children —in such school zone; and as to others, the same situation applies with regard to white children. The enrollment of all students in Grade One is 12% of the entire school population of Nashville and consists of approximately 3,400 students, of whom 1,400 are Negroes—a ratio of more than 41% of Negro students in the first grade. Here, however, comes into play a factor that complicates the desegregation of schools—residential segregation, one facet of the problem that, like school segregation and other discrimination, results in what might be termed economic segregation, a virtual denial of equal opportunity of work, employment, living conditions, advancement, and income, existing in varying degrees, in every state of the union. In the instant case, because of residential segregation, only 115 of the 1,400 Negro students in the first grade were eligible to attend schools previously attended only by white students, under the zoning system based on residence; and only 55 of the 2,000 white students in the first grade were eligible to attend schools previously attended only by Negro students. All 55 of the white students were, through their parents, granted transfers to white schools, and 105 of the 115 Negro students were, through their parents, granted transfers to Negro schools. In cities having a large Negro population, Negroes usually live, as a group, in certain areas, largely because of the fact that residential restrictions, in the way of restrictive covenants running with the land, have, for many years, made it impossible for them to live elsewhere, and, as a result, especially in cities of the North, they have been confined to run-

down residential areas with the poorest accommodations, at high rents. This case is not concerned with that problem, however, but reference is made to the fact as indicating the reason why schools in certain areas are attended wholly by Negro children, both in states where, heretofore, segregation has been sanctioned by state law, as well as in states where, theoretically, segregation has been condemned.

Based on the zones established by the Board of Education, then, there would probably, at the present time, be Negro children in every school in Nashville, although when the zones were first established, there were, perhaps, ten school zones that did not have a single Negro child in them. The intervening change is due to the continually shifting population. After the order of desegregation in the instant case, there were six of the elementary schools that had both white and Negro children. One of such schools had one Negro child, but on the first day of integration, that school was bombed and destroyed by criminal elements, leaving five schools with children of both races. However, as above suggested, if the parents of Negro students had not asked for the transfer of their children to schools in which the predominant number of students was Negro, there would have been several more schools with students of both races.

After the Board of Education had desegregated Grade One, and the district court had required that a plan for future desegregation in the other grades be submitted, the Board sought the recommendations of the school principals, and, with this objective, the Superintendent of Schools of the City of Nashville called together all of the principals of the 38 elementary schools, announcing to them the necessity of submitting a plan for desegregating the remaining eleven grades. He commenced by stating that he had great respect for their judgment; that they were close to the entire matter; that they were interested in the children; and that he would like to have their suggestions as to the best plan to be adopted.

The principals appointed a committee of themselves to draw up a questionnaire, which all principals were invited to answer, without disclosing their names. The questionnaires were, accordingly, answered by the principals, and thereafter submitted to the Superintendent of Schools. In these replies to the questionnaires, one principal advocated immediate desegregation of all grades in all schools. Thirty-seven principals advocated a gradual plan, or a year-by-year plan. The plan determined upon, after Grade One was desegregated, was to desegregate a grade a year, commencing with the second grade and continuing year by year until the entire twelve grades had been desegregated. This plan was the one which the Superintendent of Schools subsequently agreed was the best plan, and was the one adopted by the Board of Education, which was submitted to the district court and approved by it.

■ The reasons why the school authorities supported this plan and considered it the best, under the circumstances, are pertinent to the determination of the issues before us, inasmuch as the solution of such school problems is the primary responsibility of the local school authorities. Brown v. Board of Education, supra.

In his testimony as to the reasons why he favored the grade-by-grade plan of desegregation, the Superintendent of Schools declared, preliminary to an exposition of his views, that the school authorities had considerable difficulty, which was accompanied by confusion and disorder, when the plan was put into effect, in spite of the fact that they did everything they could to avoid it; that advance registrations were held "so that when the little first-graders registered, there wouldn't be any upper classmen or their parents there. We arranged so that the little Negro children and their parents would not have to go to a school where the majority of the folk were white, to get their transfers. We made the same arrangement with regard to the white children who had to get trans-

fers. We did everything we knew to do, and in spite of everything we could do, we lost about $70,000 worth of the Hattie Cotton building [through bombing], and a great many little children whose first experience in school should have been one of security and harmony and joy found themselves faced with a situation where they were subjected to dread and fright and, in many cases, actual danger. I think that the effect of that sort of thing on a child is something that should be avoided * * * and I think the year-by-year plan * * * will involve less of this damage to the children than any other plan we could propose. * * * Segregation by race in the public schools of Nashville (right or wrong) is a practice of long standing, and to change it goes counter to the feelings of a great many people. There are a lot of adjustments to be made on the part of the Negro children (it's something they're not accustomed to), on the part of the white children (it's something they're not accustomed to), on the part of the parents, and on the part of teachers. It's something none of us are accustomed to. It involves more difficulty in adjustment than someone just looking on from the sidelines would recognize or realize, and I firmly believe that this adjustment can be made with less friction, it can be made with less disadvantage to everybody concerned, it can be made more smoothly, it can be made with less difficulty, psychologically, educationally, socially, and otherwise if it is done slowly. This plan, of course, proposes that it be done slowly. * * * I assume that the white race wants to remain a white race and the Negro race want to remain a Negro race as far as race is concerned. The two races live together and work together in the same city and the same community. It's very important that there be between the two races and between individuals representing the two races a relationship of friendliness, co-operation, and respect such as I think we have had in the past to a large degree and which I think has improved a great

deal during the past twenty or thirty years."

Another reason why the Superintendent favored the plan was that it provided for a more homogeneous grouping of students. He stated that in such a homogeneous grouping, consideration was given to several factors, other than race. "In fact, I wouldn't consider that as the principal factor that I had in mind." Rather, he said, it was a matter of background, of aptitudes, of achievement. The matter of homogeneous grouping was something that they had been dealing with in Nashville for a long time before the matter of desegregation arose, and would always continue to be a problem. But the Superintendent felt that the plan of desegregation approved by the district court would make for a more homogeneous grouping of students, which educators felt was a wise thing to achieve. He stated that they could not always have students of just the same aptitude, the same social background, the same chronological age, and the same achievement level; but that they would be further from having such homogeneity if there were quick desegregation. The principal person, he declared, whose welfare is to be considered in the matter of homogeneous grouping, is the student. If desegregation occurred immediately, he went on, there would be a situation where a group of students, or individual students, would be competing with others at a disadvantage, and a number of students would have to be held back because of others who were not on the same achievement plane with them.

The Acting Chairman of the School Board of the City of Nashville also testified as to the plan approved by the district court, and outlined various plans considered by the Board, and the reasons favoring the grade-by-grade plan. He stated that the Board invited various groups to appear before it; that there were also extremists of both sides who presented their views; that organizations sponsored by groups outside Nash-

ville gave advice and, as experts, sought to give professional and expert assistance; that they were far apart in their views; and that the main concern of the Board was that "the children" whom "everybody had been forgetting, were the ones to be educated, and also we are concerned about obeying the laws of the land." He told about the difficulties encountered when the first grade was desegregated; of the disorders at the schools when every police officer on the force was called into service, "and it was still pretty rough." The Chairman had a son who was starting in the first grade. He stated: "I went through the crowd to take my child to school, and if I hadn't been on the Board, he wouldn't have gone back the next day, because it wasn't the right condition for a child to go to school. * * * The next day there wasn't anybody there but about one or two boys, mine and another boy, and a little colored boy. That's just about all they had the rest of the week, so I did not see any use in staying there. * * * They got up as high as fifteen or twenty during the [next] week." The Chairman felt that with the year-by-year plan, the opposition would be less each year the plan proceeded. He stated that, while the main trouble in desegregation came from outside the school, nevertheless there was tension affecting the teachers; but that in spite of the opposition of certain white parents, the teachers were able to handle the situation. It was, he said, a new experience for the teacher. She did not want the white parents "jumping on her neck," and she didn't want to hurt the little colored boy in the class; but the size of the problem had been such that the teachers had been able to handle it. He felt that the plan, starting with the first grade, and continuing each year up another grade, would be successful. The Negro and white children would already be a part of the class when it went into the higher grade. They would keep their achievement level as they went through their school years; they would have gone through the same educational experienc-es, from the first grade up to the twelfth grade, year by year. For these reasons, the Chairman felt that the year-by-year plan was the best that could be devised. He stated that consideration had been given to a plan to desegregate first the twelfth grade, then the eleventh, and so down, but the Superintendent had expressed the opinion that such a plan was educationally unsound; and the Board felt that, because of the transfer provisions of the plan, there would be no desegregation whatever in those grades, and that such a plan "would be trying to get around the court order, and we were not trying to do that. We were trying to abide by the court ruling, and not try to get around it. So we switched ends then and started to try to work out the best we could from an educational standpoint."

Another witness for appellees was Miss Mary Brent, a teacher in the Nashville schools for twenty-four years, and a principal for nineteen years. She told of the first two Negro children in the first grade of the Glenn School, of which she is principal, and of her views in support of the year-by-year plan of desegregation. The educational progress of one of the Negro children, during her first year with white children, had been exceptionally good. For the other, the work had been hard because she was one of the youngest in the age group in the first grade. They both made satisfactory progress, however, and as far as the aptitudes of the two Negro students were concerned, there was no difference as compared to the white students. The witness was the principal on duty when disturbances and violence occurred at the beginning of desegregation; and since that time, up to the hearing in the district court, tension, she said, had continued to exist. The two Negro children were brought to school each day, and afterward, taken home by one of the parents. They were well accepted by the white children in the first grade. Small children, she stated, have no racial prejudice; but this was not true of older children in the fourth or fifth grades, at the

time the first grade was desegregated, when some prejudice was manifested by older students, and trouble occurred. The teachers during the first six weeks were subjected to criticism and arguments from parents coming to the school, and later on, by abusive and vulgar anonymous telephone calls. However, Miss Brent, speaking as a principal, felt that the year-by-year plan was the only one they could accept and make work in Nashville "right now." "If people," she declared, "had been at Glenn School as I was during the last of August and most all of September last year—in 1957, they would realize that it was not an easy thing to do. Any radical change is bound to bring chaos, and this was certainly a radical change."

"Now, in an educational institution," Miss Brent testified, "teachers cannot do their best in the midst of excitement and turmoil and upheaval. I feel that if we can do this and get it over in people's minds that it is the law of the land, that we are trying to do our best to accomplish the purpose that the Supreme Court —the thing that the Supreme Court has set up for us to do, if we do it gradually, let them get accustomed to it gradually, I believe we will have a much better chance of succeeding in the end."

Miss Brent further observed, in her testimony: "To me, integration and desegregation are not the same thing, and we would like very much at the end of 11 years, or however many years it takes, to feel that the schools are truly integrated, that it's not just a question of their being desegregated. That feeling will have to come from the hearts of people. It cannot be forced, and it certainly cannot be thrust upon them in a hurry. In the second place, I feel that little children, for instance, these children in the first grade, now are absolutely accustomed to having the Negro and the white child right there together. They play together. They eat together. Everything goes along just the same. There's no difference whatsoever made. Well, if that group moves on next year to the second grade, they will still be accustomed to that. The children that are coming in in the first grade naturally expect their group to be desegregated. If you jump and begin to take children in higher grades, you are going to double your trouble. I firmly believe that it is the only plan. * * * We firmly believe now that they have a foundation that will prepare them to go along into the second grade with the white children. They will the next year be able to progress. There will be no differences in their (shall we say) background. We feel that educationally it will be the best thing for the child, and, after all, that is what we are concerned with. We leave the outside trouble to the policemen."

W. A. Bass, Superintendent of Schools of Nashville, when this suit began, testified as to the reasons that impelled him to support the year-by-year plan, and further discussed the difficulties in securing teacher cooperation, as well as questions of teacher recruitment, and achievement levels of the students.

As reasons for supporting the Board's plan, Mr. Bass said: "I think I have two reasons I should like to state: Number one is the—is the distinct recognition of the fact that the children grow from what they are to what they subsequently become. They don't become what they do become, immediately and at once. And so I based my recommendation on that fact, that adjustment to an entirely new community problem, such as is involved in the change of attitude, the change of practice, the change in tradition that this or that plan of desegregation involves—I reached the conclusion that basing any decision upon the natural growth and development of children would be the only safe and sound approach to the problem.

"Another problem: Schools are not— not just school buildings and just school children. They have teachers there. I took into account the teacher problem and experience I had had with teachers.

"When I came to Nashville as Superintendent of Schools (and this fact can be established in the mouths of many witnesses), I called a meeting of the English

teachers in the junior- and senior-high-school groups. It had never occurred to me that I would have any difficulty because as State Supervisor of High Schools I had held conferences all over the state involving both white and Negro teachers primarily in the county schools.

"Well, the day came for the meeting I had personally called. I was in my office gathering up some material I was taking to the meeting. At that time, our Negro schools were opened ten minutes earlier than the white, and as a consequence they dismissed ten minutes earlier. Our Negro teachers arrived on the scene ten minutes ahead of the white teachers. They went in the room and in a normal manner took their seats in the room.

"Just before I started from my office down to the meeting place, the Principal came down all excited. He said: 'The white teachers won't go in. The Negro teachers have taken their places about over the room, and they won't go in and sit by them.' That was the coldest, most unsatisfactory educational meeting I ever presided over. * * * And so I had to change my tactics, and I started with the principals and supervisors. We had mixed meetings and we finally got common understanding, but it took 10 years to get that done where the teachers and principals and supervisors would sit down and talk in confidence. * * * The question, it seems to me, is one of law, what is the best way to comply with the law of the United States as expressed through the Supreme Court. And—I'm in favor of the Board of Education carrying it out. I know what it is. I have read it over and over, every word of it, and I gave considerable thought to that question of 'all deliberate speed.' Now, we deliberated (and I think we were entitled under the Supreme Court's decision to be deliberate) about this matter. We are not just trying to stand in the way. We are trying to determine the scope that we can take and do the job effectively. * * * I have tried as the Superintendent of the schools, through the principals and teachers at my disposal, to teach people to respect the law, and that I maintain today. * * * This business of teaching and working through teachers is not just a legal matter. It's a spiritual matter at base, and unless we can develop that rapport which a teaching group must have to touch the lives of children, we are not a successful school system, however good our buildings may be or whatever other physical features we may have. * * * I think the teachers can't absorb too big a piece of this problem at one time, and I think the community will gradually see that their first impressions were erroneous and that this problem can be handled systematically with mutual benefit." The witness further testified: "In this community, consisting of the County and City Schools, we need this year three hundred new teachers. It is a problem to get elementary school teachers. It's my job as Superintendent of Schools to interview all applicants for teaching positions in the Nashville Schools. As School Superintendent and as interviewer for the Board, I have discovered that many teachers who might offer their services as teachers decline to teach in a desegregated school system. Now, it's difficult without this problem being raised. It will be more difficult otherwise. The Board knows that. That's what I have reference to by teacher recruitment." He referred to a difference in the achievement level of pupils in the same grade and stated that, on the basis of evidence—test results—the teachers know that, in the field of arithmatic, for example, in the eighth grade, the level of achievement of the white children is two and a half years above that of the Negro children, and that that constituted a teaching problem. He stated that the schools' psychological testing service in 1954–55 released its publication showing that fact, and other facts relating to it; that the difference in the achievement level of the Negro and white students varied in certain subjects, but showed, in the sixth grade, a difference of about two years and some months, and a differ-

ence in the achievement level, in the fourth grade, of about one year.

With regard to the foregoing, it is to be noted that Dr. Henry H. Hill, President of George Peabody College for Teachers, a former Superintendent of Schools in Pittsburgh, Pennsylvania, as well as in Lexington, Kentucky, and Walnut Ridge, Arkansas, and Dean of the University of Kentucky, called as an expert in education on behalf of appellees, stated: "Children vary widely apart in their ability and willingness to learn, and that is not a racial problem; it's just something everybody knows but few people appreciate the fact; that in the fifth grade, for example, there will be a range of reading ability possibly from the second grade to the eighth, certainly from the third to the seventh, in an average unselected fifth grade, whether white or Negro, or white and Negro, as far as I know, the variations would only be a little wider. It depends, of course, on the community.

"I would like to point out in this connection that in desegregation in the North, at least in the areas that I am most familiar with, there are all Negro and all white schools, or substantially so. There are all Negro high schools in Chicago, for example; there are in Detroit; and there are in New York, due as much as anything else, not to the fact of segregation or all Negro or all white compulsory, but to the fact that Public Schools, if they are well located, are located in the middle of the children, where the children live. So, if you have a well located school in Pittsburgh, for example, in the Hill District, which is largely Negro, you would naturally expect to find a considerable number, mostly Negroes, in that school even though you have no legal segregation. In other words, I think, and I'm no authority here at all and don't pretend to be an authority anywhere, I think residential movements set the basic pattern."

The plan approved by the district court had been adopted by a vote of all of the members of the Board of Education, with the exception of Mr. Coyness L.

Ennix, the sole Negro member, who opposed it on the ground that it unreasonably delayed full desegregation. As indicating one of the complex cross-currents of viewpoint, one of the members of the Board, Mr. O. B. Hofstetter, a witness called by appellants, and a member of the Roman Catholic Church, which had completely desegregated all of its elementary and high schools in Nashville three years before the judgment of the district court in this case, however, favored and supported the Board's plan of grade-by-grade desegregation, in the public schools.

As stated by the district court, the plan of the Board to desegregate the schools one grade each year was strongly supported by the first four witnesses heretofore mentioned; and the court declared that there could be no doubt that the view of these witnesses, based upon their years of experience in education and upon their intimate knowledge of conditions in Nashville, disclosed a sincere belief that a sudden or abrupt transition to a desegregated basis would engender administrative problems of such complexity and magnitude as to undermine seriously and impair the educational system of the city, and that they supported the plan of the Board of Education primarily because they felt that it offered the best opportunity to bring about full desegregation harmoniously and without serious disruption of the educational program of the city.

Opposed to the views of the witnesses for appellees were Dr. Herman H. Long, Dr. Preston Valien, Mrs. Preston Valien, and Mr. Ennix. There was no question that Dr. Long, Dr. Valien, and Mrs. Valien were experts in the field of education, and particularly with respect to the question of desegregation, and, as mentioned, Mr. Ennix, himself, was a member of the Board of Education. Dr. Long was a graduate of Talladega College in Alabama, received his master's degree from Hartford Seminary Foundation, and his doctorate degree in psychology from the University of Michigan. He had taught in Miles College, where he

was Dean of Instruction. At the time he testified, he was associated with the Department of Race Relations at Fisk University, in Nashville. Although he had no direct experience as a teacher with the problem of desegregation, he had, nevertheless, assisted in surveys relating generally to practices affecting the status of minority groups in the fields of education, housing, employment, social welfare services, hospital services, and the like. In a survey in connection with education in Baltimore, where he was one of those invited to participate by the Governor's Interracial Commission, and the Mayor's Interracial Commission, the teachers of Baltimore were asked whether they would have any difficulties in teaching Negro and white children in the same class, and about 30 per cent of the teachers replied that they would not be able successfully to carry out such teaching assignments; but the following term, the schools were integrated, and the teachers were able fairly successfully to teach both Negro and white children in the same class. With regard to the Nashville plan, Dr. Long said: "I am afraid that a large number of people tend to believe that a special kind of plan used by a school board to desegregate the schools is the final test of whether or not you will have effective desegregation, and the assumption seems to be that if the plan protracts the process of change over a long period of years (I think this is—is basic to the Nashville proposal) that you will have a smoother plan of operation and you will have less difficulty. I believe that this assumption isn't entirely sound in looking at the experience of other school systems and the experiences I have had generally in the field of race relations for several reasons: One reason is that any proposed change in this field as well as in others takes place within a climate of opinion and a climate of expectation that is created by the kind of policies which a Board of Education or which any other board, whether it is a board of—of an industry, creates in the public mind. I think it has been fairly well shown that when policies enacted by such boards are vacillating policies (that is, they do not proceed with clear pronunciation of purpose and without qualification) that when the processes of change in the school system are attempted, you get resistance because the public does not expect that the board means what it says in many of these instances."

Dr. Long further testified: "[In the Nashville plan] one of the assumptions is that if you minimize the change, you reduce the resistance. We need to analyze the character of the resistance, and if we look at our experience in Nashville last year, the people who constituted the protesters and the mobs, the people who were arrested and fined, either fined in court or put under injunction in the court, expressed an attitude which was completely unreasoning as to any kind of change. I think the pattern that is expressing itself is one in which any kind of change toward desegregating schools or any other institutions will meet resistance on the part of this element of the population. The merits of whether or not the change is done in 12 years or whether it's done in one year doesn't enter into this kind of resistance effort because it is fairly completely unreasoning and inconsiderate effort. It's not an effort to meet the issues in terms of any kind of statesmanship. * * * You have now out of the nine states—of the 17 states that were originally operating on the basis of segregated schools, you have nine of those states which have begun desegregation. You have over 300,000 or 350,000 Negro children in integrated schools within three years' time. You have a complete—almost complete desegregation of the school systems of West Virginia. All of these instances were where people had the same attitude toward desegregation that I presume we have in Nashville to a more or less degree."

On cross examination, Dr. Long, after stating that he received the Southern School News every month, was asked whether he agreed with the statement, in the March, 1958, issue, of Congressman Adam Clayton Powell, when he declared:

"I don't believe there should be immediate integration all over the South. But there should be a beginning, a plan in sensitive areas. Integration should start in kindergartens. In this manner, the problem could be eliminated in 12 years." When counsel asked: "Now I believe you take issue with that viewpoint?", Dr. Long's reply was: "I take issue with the viewpoint as—as—It expresses a general philosophy which—with which I concur. I take issue with protracting school desegregation over a 12-year period. I don't think that it solves—I think I gave the reasons why. I think it's—It's the hard way around the problem rather than the easy way around."

Dr. Preston Valien, a professor at Fisk University in Nashville for twenty years, had, with his wife, engaged in studies of desegregated situations in many places, having served as consultants at the University of Kentucky, with teachers at Louisville and Lexington. They had made studies of Clinton, Tennessee, Little Rock, Arkansas, Cairo, Illinois, and St. Louis, Missouri. He considered that the Nashville plan was not educationally sound; that a whole generation of public-school Negro students, beginning, at that time, with those in the second grade, "would be denied the right to have their constitutional rights determined, under this particular plan;" that the situation was calculated to engender tension when there were families in which some children could not go to the same school; that the teachers would be divided into those opposed to teaching desegregated classes, and those not so opposed; that such a plan usually engendered confusion and tension. Dr. Valien stated that "when a large number of people are involved and intimately concerned with a particular social-change process, the transition is likely to be smoother than when it focuses on a smaller number and leaves a large crowd who act as spectators and not concerned in the situation." The witness felt that the schools should be desegregated "on the basis of elementary schools one period,

high schools in another period, and have the junior high school fitting in there somewhere." He advocated the desegregation of each one of these units at a time.

Mrs. Preston Valien, an assistant professor of sociology, with extensive graduate study, has participated in most of the desegregation research that has been done in recent years, in various cities and states. She considered that all experience indicates that where desegregation was done year by year, it merely led to tension; that where desegregation has been done rapidly and completely, the amount of tension is minimized. She stated: "I think that the longer Nashville waits, the less likely it's going to be able to do its job as efficiently and as thoroughly and without less tension than it would have earlier because I think increasingly the longer we wait, the more difficulty and the more tension we vie. And that's in the nature of social change. That always happens. * * * I want to introduce another dimension, though, that I think hasn't been said. I think we have done an awful lot of discussion with reference to what this does for Negroes. As a social scientist, I am concerned about children. I'm concerned about what this does for all people. And in every community where I have been, the one thing that I want to report to this audience is the number of happy white mothers and white children who say that for once 'I can enter as a citizen and feel whole and complete. No longer do I feel guilty.' And one of the things that we have to face, and that is that we are now moving into a world in which there is no place really for the perpetuation of the kind of society which we have. The largest percentage of our people over this world are now colored people. It is unfair to children to give them a false conception of the world in which we now live."

Mrs. Valien testified that she thought Nashville should desegregate its schools, at that time, totally and completely. She considered that the plan should not permit transfers of students, as presently

provided, because it was wrong, "sociologically, psychologically, and every other way."

Mr. Ennix, the Negro member of the School Board, opposed the plan because he felt that the Board was not proceeding with all deliberate speed. He had submitted to the Board a plan to desegregate, first, the grades from the first to the sixth; after that, the junior high schools; and after that, the senior high schools. He suggested a two-or three-year stage. At first, he had advocated immediate and complete desegregation, but after 1957, he thought a slower plan was wise, although not a grade-by-grade plan. He considered that the other members of the Board had acted in good faith. He and other members of the Board had often sharply differed on other matters and he always had full opportunity to state his point of view in the meetings, where matters were the subject of free and general discussion by all those present. "I think they were conscientious about what they were saying, and I certainly was conscientious about mine. * * * I think that the Board members, each one of them, conscientiously feel that it is best to go grade for grade."

The district court, in its findings, stated that the Superintendent of Schools, the former Superintendent of Schools, the Chairman of the Instruction Commission (who was also Acting Chairman of the Board of Education), and a principal of one of the elementary schools in which desegregation was first carried out, were unanimous in their sincere belief, based upon their years of experience and upon their intimate knowledge of the conditions in Nashville, that a sudden or abrupt transition to a desegregated basis would engender administrative problems of such complexity and magnitude as to seriously undermine and impair the educational system of the City. The court further found that these four witnesses were convinced that the change-over from a segregated system of public education in that particular area was one of such drastic character, such a reversal

of custom, tradition, and settled practice, that disagreement with it is pervasive, far-reaching, and deep-seated; that proper school administration requires that the School Board take into account the existence of this factor, not to accede to hostility or placate the opponents of desegregation, but in order to minimize the effects of opposition upon the efficiency of the schools; and that they support the School Board's plan primarily because they feel that it offers the best opportunity to bring about full desegregation harmoniously and without serious disruption of the educational program of the City.

In commenting in favorable terms upon the educational background and experience of appellants' witnesses, the court observed that they have had no direct or official connection with the public schools of Nashville, other than the single School Board member, and the court noted the disagreement among them as to the best plan to be followed; that Dr. Long and Mrs. Valien favored a plan which would require immediate desegregation in all of the public schools of the City; that Dr. Preston Valien, on the other hand, advocated a plan which would accomplish desegregation on the basis of administrative units, that is, first, the elementary schools would be desegregated, then the junior high schools, and finally, the high schools; and that Mr. Ennix first favored a plan of total and immediate desegregation, but that his views had since been changed to support the administrative unit plan advocated by Dr. Valien, or some gradual plan of a similar nature.

Holding that the appellees had carried the burden of proof of establishing the validity of the School Board's plan, and that it should, therefore, be approved, the court, in its opinion, declared that "it is not the business of the Federal Courts to operate the public schools and they should intervene only when it is necessary for the enforcement of rights protected by the Federal Constitution. If the judgment of the School Board was clearly erroneous, or if it was not sup-

ported by the evidence, the Court would be justified in finding that the defendants had not carried the burden of proof resting upon them and that the School Board's plan should be disapproved. However, where in this case, the judgment of the School Board is supported by the clear preponderance of the evidence, it would be an unwarranted invasion of the lawful prerogatives of the legally constituted school authority if the Court should undertake to set its judgment aside and substitute some other plan. Admittedly the problem is not susceptible of an easy solution. The Supreme Court of the United States has made it clear that adjustment must be made in accordance with the exigencies of each case, and that the concept of 'all deliberate speed' is a flexible one. For this reason decisions applying the desegregation doctrine in other cities or areas where different conditions obtain are of little value. Local conditions call for the application of a local remedy.

"In approving the present plan no denial of the constitutional rights of the plaintiffs or others similarly situated is involved. Such rights are distinctly recognized and the plan contemplates their full enforcement and application in accordance with a time schedule which though protracted for the best interests of the school system as a whole is nevertheless definite and unambiguous. Full desegregation is not denied. It is merely postponed."

■ Cases involving desegregation, like other cases, depend largely on the facts. While the law has been stated, perhaps, as definitely as it can be stated at the present time, by the Supreme Court, nevertheless, its application depends upon the facts of each particular case. "[Because] of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity." Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873. "Full implementation of these constitutional principles may require solution of varied local school problems. School authorities

have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal. * * *

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." Brown v. Board of Education, 349 U.S. 294, 299, 300, 75 S.Ct. 753, 765, 99 L.Ed. 1083. The court further went on to say that at stake was the personal interest of the plaintiffs in admission to the public schools as soon as possible on a non-discriminatory basis; that effectuating this interest may call for elimination of a variety of obstacles in making the transition; that courts of equity may properly take into consideration the public interest in the elimination of such obstacles; that, once a start is made, the courts may find that additional time is necessary to carry out the ruling in an effective manner.

"Of course, in many locations, obedience to the duty of desegregation would require the immediate general admission of Negro children, otherwise qualified as students for their appropriate classes, at particular schools. On the other hand, a District Court, after analysis of the relevant factors (which, of course, excludes hostility to racial desegregation), might conclude that justification existed for not requiring the present nonsegregated admission of all qualified Negro children. In such circumstances, however, the Courts should scrutinize the program of the school authorities to make sure that they had developed arrangements pointed toward the earliest practical completion of desegregation, and had taken appropriate steps to put

their program into effective operation. It was made plain that delay in any guise in order to deny the constitutional rights of Negro children could not be countenanced, and that only a prompt start, diligently and earnestly pursued, to eliminate racial segregation from the public schools could constitute good faith compliance." Cooper v. Aaron, 358 U.S. 1, 7, 78 S.Ct. 1401, 1404, 3 L.Ed.2d 5.

In its opinion in the foregoing case, the Supreme Court, referred to another Aaron case which had gone up from the district court, and had been affirmed by the Court of Appeals, 8 Cir., 243 F.2d 361, from which judgment no review had been sought in the Supreme Court. In the opinion in this latter Aaron case, the district court had relied upon, and quoted from the opinion of the three-judge court, presided over by Judge John J. Parker, sitting in the Eastern District of South Carolina, in the case of Briggs v. Elliott, D.C., 132 F.Supp. 776, in which that court said, with reference to the rule announced by the Supreme Court in the desegregation cases:

" 'It has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose

the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation.' * * * Because of the nature of the problems and the local conditions, the school authorities often find that action taken by other school districts is inapplicable to the facts with which they are dealing. * * * [The] free public schools must be maintained and operated as a racially nondiscriminatory system. During the period of transition from a segregated to a nonsegregated system the school authorities must exercise good faith. They must consider the personal rights of all qualified persons to be admitted to the free public schools as soon as practicable on a nondiscriminatory basis. The public interest must be considered along with all the facts and conditions prevalent in the school district. Educational standards should not be lowered. If the school authorities have acted and are proceeding in good faith, their actions should not be set aside by a court so long as their action is consistent with the ultimate establishment of a nondiscriminatory school system at the earliest practicable date." Aaron v. Cooper, D.C., 143 F.Supp. 855 at pages 864, 865.

In the Aaron case, on appeal to the Court of Appeals for the Eighth Circuit, Aaron v. Cooper, 243 F.2d 361, 363, the court said: "The District Court's approval of the three-phase plan for integration came only after a finding of utmost good faith on the part of the school authorities, which finding is not challenged in these proceedings. * * * During the trial * * * the superintendent gave convincing and competent testimony to the effect that under existing conditions gradual integration of the schools was administratively advisable.

Desirability of gradual as opposed to immediate integration was premised on factors referred to in the second Brown decision. The superintendent's testimony was not contradicted." Referring to numerous cases where the federal courts had used their injunctive powers to speed up, or effectuate integration, the court observed: "These decisions serve only to demonstrate that local school problems are 'varied' as referred to by the Supreme Court," and that what would be a reasonable amount of time to effect complete integration in one city or area, might be unreasonable in another. The court continued:

"It was on the basis of such 'varied' school problems that the Supreme Court in the second Brown decision remanded the cases there involved to the local District Courts to determine whether the school authorities, who possessed the primary responsibility, have acted in good faith, made a prompt and reasonable start, and whether or not additional time was necessary to accomplish complete desegregation. The question of speed was to be decided with reference to existing local conditions. There is here unqualified basis for the District Court's conclusions that the proposed plan constitutes a good-faith, prompt, and reasonable start toward full compliance with the Supreme Court's mandate. Accordingly, we cannot say, even if we were so minded, that the District Court's conclusions were entirely erroneous and should be set aside. Nor can we say that a gradual program of integration beginning at the high school level and ultimately encompassing all grades, is an unreasonable one."

The complaint of appellants is that the plan does not conform to the mandate that desegregation take place with all deliberate speed. As Mr. Justice Frankfurter said in his concurring opinion in Cooper v. Aaron, supra [358 U.S. 1, 78 S.Ct. 1412]: "Only the constructive use of time will achieve what an advanced civilization demands and the Constitution confirms." In the Court of Appeals, in Aaron v. Cooper, 8 Cir., 243 F.2d 361, it was observed that a reasonable amount of time to effect complete integration, in certain places, might be unreasonable in other places. It was said, in another case, that "a good faith acceptance by the school board of the underlying principle of equality of education for all children with no classification of race might well warrant the allowance by the trial court of time for such reasonable steps in the process of desegregation as appear to be helpful in avoiding unseemly confusion and turmoil." Orleans Parish School Board v. Bush, 5 Cir., 242 F.2d 156, 166.

As to the prospect of shortening the time proposed in the plan, it was said by the Court of Appeals of the Eighth Circuit, in Aaron v. Cooper, 243 F.2d 361:

"It may well be, in the light of future events, that the proposed program of integration extends over too long a period and that complete integration of all grades could be effected in a shorter space of time than now anticipated by the board. In that regard, it will be noted that the District Court in its order provided for retention of jurisdiction as directed by the Supreme Court in the second Brown decision. It may be that in the future as the plan of integration begins to operate, a showing could then be made to the effect that more time was being taken than was necessary. Upon such a finding, the District Court would have the power to see that the plan of gradual integration was accelerated at a greater rate than now proposed. That remains for future determination.

"Jurisdiction of this case shall be retained by the District Court to insure full opportunity for further showing in the event compliance at the 'earliest practicable date' ceases to be the objective." Aaron v. Cooper, 8 Cir., 243 F.2d 361, 363, 364.

The findings of the district court were sustained by the evidence. There is no claim that the Board of Education did not act in good faith. The plan is supported by practically all of the teachers in the schools. The reasons for the support of the plan were clearly given by the Superintendent of Schools, the former Superintendent of Schools, by the Acting Chairman of the Board of Education, and by one of the most experienced principals and teachers where the desegregation plan was operating. Among those reasons, including difficulties arising from the recruitment of teachers, was the most persuasive one—that children in the first grade had no sense of discrimination; that as the classes of Negro and white children progressed year by year up through high school, they would know no feelings of racial discrimination, until the entire school system had been harmoniously integrated. One may disagree with the gradual process, but we cannot say that such a plan is so unreasonable that the judgment of the district court approving the plan, in the light of the evidence before it, should be reversed as clearly erroneous.

■ Also, it is to be said that this year, the first three grades of all public schools in Nashville will have been desegregated, leaving, at most, a nine-year period thereafter for complete integration. Moreover, it may be, as said in Aaron v. Cooper, 8 Cir., 243 F.2d 361, that in the light of future events, the proposed program of integration extends over too long a period and that a complete integration of all grades could be effected in a shorter space of time than now contemplated by the Board. If in the future as the program continues, it could be shown that more time was being taken than necessary, the district court would have the power to see that the plan was accelerated. It is for that reason, principally, that jurisdiction is retained by the district court to insure a

full opportunity for a further showing, in the event that compliance with the Supreme Court mandate for desegregation at the earliest practicable date ceases to be the objective of those in positions of authority.[1]

We cannot say that the district court's conclusions, in the instant case, were entirely erroneous, and, for that reason, should be set aside; nor can we say that the gradual program of integration beginning in the first grade, and ultimately encompassing all grades, is clearly an unreasonable one. Even were we inclined to differ with the program, and even though we felt that it was too gradual in its application, we could not say that the judgment approving the plan was clearly erroneous, and that the plan, in this regard, was not reasonable.

■ We come, then, to the transfer provision of the plan, allowing the voluntary transfer of white and Negro students, who would otherwise be required to attend schools previously serving only members of the other race;▪ and allowing the voluntary transfer of any student from a school where the majority of the students are of a different race. This provision does not fall within the ban of the maintenance of segregated public schools by cities where permitted—though not required—by statute, such as was condemned by the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. The district court, in the instant case, considered that, in accordance with the reasoning in Briggs v. Elliott, D.C.S.C., 132 F.Supp. 776, 777, the transfer provisions did not violate the equal protection clause of the Fourteenth Amendment. In the Briggs case, it was declared, as we have heretofore mentioned, that the Supreme Court has not decided that the states must deprive persons of the right of choosing what schools they attend, but that all it has decided is that a state may not deny to any person, on account of

---

1. In Aaron v. Cooper, D.C., 143 F.Supp. 855, the plan for integration extended over seven years; in Evans v. Buchanan, D.C.Del., 172 F.Supp. 508, the plan for integration starts, like the instant case, in the first grade, and proceeds a grade each year until the entire twelve grades are desegregated.

race, the right to attend any school that it maintains. "This," said the court, as we have previously quoted, on another aspect of this case, "under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races attend different schools. * * *" Appellants say that the transfer plan is only a scheme to evade the decisions of the Supreme Court. In Cooper v. Aaron, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, it was said: "In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this court in the Brown case, can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.' " There is no evidence before us that the transfer plan is an evasive scheme for segregation. If the child is free to attend an integrated school, and his parents voluntarily choose a school where only one race attends, he is not being deprived of his constitutional rights. It is conceivable that the parent may have made the choice from a variety of reasons—concern that his child might otherwise not be treated in a kindly way; personal fear of some kind of economic reprisal; or a feeling that the child's life will be more harmonious with members of his own race. In common justice, the choice should be a free choice, uninfluenced by fear of injury, physical or economic, or by anxieties on the part of a child or his parents. The choice, provided in the plan of the Board, is, in law, a free and voluntary choice. It is the denial of the right to attend a nonsegregated school that violates the child's constitutional rights. It is the exclusion of children from such a school that "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way un-

likely ever to be undone," as observed in Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873. Such may be the tragic result, when children realize that society is imposing a restriction upon them because of their race or color. The Supreme Court remarked in the foregoing case that the effect of the separation of students because of race was "well stated" by the district court in the case, then on review, when it declared:

"Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of the child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system."

Nevertheless, as stated in Brown v. Board of Education, D.C., 139 F.Supp. 468, 469, 470, subsequent to the decision of the Supreme Court in the prior Brown case:

"Desegregation does not mean that there must be intermingling of the races in all school districts. It means only that they may not be prevented from intermingling or going to school together because of race or color.

"If it is a fact, as we understand it is, with respect to Buchanan School that the district is inhabited by colored students, no violation of any constitutional right results because they are compelled to attend the school in the district in which they live."

While, in the instant case, the parent makes the choice for the small child, that is the only reasonable method,

if such a choice may be made. We see no deprivation of right, under the evidence before us. Doubtlessly, fewer Negro children, or their parents, will avail themselves of the transfer provisions, as grade after grade becomes integrated, and more Negro children attend such desegregated schools as time goes on. We are not informed by the record how much such attendance has increased with the additional desegregation that has taken place since the hearing. But if it should appear, upon a showing, that there are impediments to the exercise of a free choice, and that a change should be made in the plan to carry out, in good faith, and with every safeguard to the children's rights, the mandate of the Supreme Court, the district court, having retained jurisdiction during the entire period of the process of desegregation under the Board's plan, shall make such modification in its decree as is just and proper. On the record before us, the judgment of the district court does not deprive any of the children of equal protection under the Fourteenth Amendment.

■ We consider, then, the issue that is raised upon cross appeal: whether the Fourteenth Amendment is violated by a plan, authorized by state statute, in which local school boards may provide separate schools for Negro and white children, whose parents voluntarily elect that such children attend school with members of their own race.

■ The district court held that the statute authorizing the maintenance of separate segregated schools was antagonistic to the principles declared by the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, and, therefore, was unconstitutional. The district court referred to the decisions in the above cases in which it was held that segregation of white and Negro children in the public schools of the state, solely on the basis of race, pursuant to state laws permitting or requiring such segregation in segregated schools, denied the Negro children the equal protection of the laws guaranteed by the Fourteenth Amendment. The district court held that the state statute in question was invalid in providing for separate schools for white and Negro children whose parents or guardians voluntarily elect that such children attend schools with members of their own race; that the statute providing for a census and for separate schools for Negro children, whose parents so elected, would be contrary to the Constitution since such schools would not only be separate, but separated because of race; that the separation, once made, would be compulsory; and that after such election, no Negro student would have the right to attend a school for white children, solely because of his race, nor could any white child, after an election, ever attend a school which was attended by Negro children. The Constitution prohibits the states from maintaining racially segregated public schools. Bolling v. Sharpe, 347 U.S. 497, 500, 74 S.Ct. 693, 98 L.Ed. 884.

The argument that the statute contemplated voluntary action was answered by the district court in its opinion by the statement that the statute provided for the maintenance of segregated schools for Negro and white children, from which the children of the other race were excluded; that the statute further provided that, after a census of parents of school children had been taken, and preferences for such segregated schools ascertained, those schools would be required to be maintained thereafter as separate and segregated schools; and that after an election had once been made, it was binding on the child for the future. The court pointed out that the transfer system, which it had approved, giving Negro students and white students an equal right to transfer from one school to another, was a limited right, and the court felt that it was a reasonable provision. It did not envisage the maintenance of schools from which students could be excluded by the authorities, because of their race.

The district court held that it was unnecessary to refer the issue of the constitutionality of the statute to a three-judge court, since the statute in question was patently and manifestly unconstitutional on its face, in the light of the decision of the Supreme Court in the two Brown cases above cited; and we concur with the determination of the district court in this regard.

The final issue is raised by the brief and argument of the *amicus curiae:* whether, absent appropriate legislation by Congress, for the enforcement of the integration of races in the public schools of the several states, the courts of the United States have power to compel, by court order, the integration of the races in such schools.

The contentions advanced in this argument resolve themselves into the proposition that, as the *amicus curiae* states it, "The decision of the Brown case does not rise to the quality of 'Law of the Land.'"

In Cooper v. Aaron, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, the Supreme Court speaking in an opinion, unusual in that it was issued under the names of all the justices, said:

"Article VI of the Constitution makes the Constitution the 'supreme Law of the Land.' In 1803, Chief Justice Marshall, speaking for a unanimous Court, referring to the Constitution as 'the fundamental and paramount law of the nation,' declared in the notable case of Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60, that 'It is emphatically the province and duty of the judicial department to say what the law is.' This decision declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system. It follows that the interpretation of the Fourteenth Amendment enunciated by this Court in the Brown case is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, cl. 3, 'to support this Constitution.' Chief Justice Taney, speaking for a unanimous Court in 1859, said that this requirement reflected the framers' 'anxiety to preserve it [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its authority, on the part of a State * * *.' Ableman v. Booth, 21 How. 506, 524, 16 L.Ed. 169.

"No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it. Chief Justice Marshall spoke for a unanimous Court in saying that: 'If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery * * *.' United States v. Peters, 5 Cranch 115, 136, 3 L.Ed. 53."

The argument of the *amicus curiae* must be held to be without merit in law.

In accordance with the foregoing, the judgment of the district court is affirmed, on the findings of fact, conclusions of law, and opinion of Judge William E. Miller.