Earl Benjamin BUSH et al., Appellants,

v.

ORLEANS PARISH SCHOOL BOARD
et al., Appellees.

No. 19720.

United States Court of Appeals
Fifth Circuit.

Aug. 6, 1962.

On Petition for Rehearing
Aug. 28, 1962.

A. P. Tureaud, New Orleans, La., Jack Greenberg, Constance Baker Motley, New York City, for appellants.

Samuel I. Rosenberg, Alvin J. Liska, City Atty., New Orleans, La., for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

■ The Orleans Parish School Board maintains a dual school system in the City of New Orleans. A dual school system is a compulsory biracial system in which certain schools are designated for Negro students and staffed by Negro personnel and certain other schools are designated for white students and staffed by white personnel. Each school draws students from its own attendance area. The city, therefore, is divided into geographical districts (zones) for Negro schools that are separate but often overlap the districts for white schools.

May 16, 1960, the District Court for the Eastern District of Louisiana ordered desegregation of public schools in New Orleans on a stepladder plan of desegregating a grade a year commencing with the first grade for the 1960–61 term. Two years later, the district court modified the 1960 Plan by an order entered April 9, 1962, and by a second order entered May 29, 1962. The plaintiffs and the Orleans Parish School Board appeal from the court's second order. We approve the order except as modified in this opinion and the order of this Court.

I.

This case is Exhibit "A" for "deliberate speed". H goes back to November 1951 when certain Negro school children, through their parents, petitioned the Or-

leans Parish School Board to desegregate the New Orleans public schools.[1] September 4, 1952, they filed a school desegregation suit against the Board. At that time there were five school segregation cases pending in the United States Supreme Court. The plaintiffs and the School Board agreed to suspend litigation until the Supreme Court should have decided the constitutional issues in the School Segregation Cases. The Supreme Court heard argument on these cases in December 1952, put them back on the docket in 1953 and, after the cases were reargued, announced its decision May 17, 1954, in Brown v. Board of Education.[2]

Six years ago, on February 15, 1956, the district court entered a preliminary injunction ordering the School Board to desegregate the New Orleans schools "with all deliberate speed".[3] Up to that time the Board's opposition to desegregation had been dictated for the most part by longstanding customs and laws long on the statute books. After the injunction was issued the Louisiana legislature enacted a massive body of laws intended to preserve segregation in the schools. For over three years the Orleans Parish School Board seemed hopelessly bogged down in a morass of confusing, harassing legislation. Finally, when it was apparent that the Board could not take independent action, the district court, July 15, 1959, ordered a desegregation plan filed March 1, 1960.[4] Later, the court extended the deadline to May 16, 1960. In April 1960, the Orleans Parish Court of Appeals ruled that under Act 319 of 1956 the legislature, not

the Board, had the right to reclassify schools classified by race. Caught again in the middle between Louisiana courts and federal courts, the Board was empty-handed on May 16, 1960. As a result, on that date, having received no plan from the Board, the district court ordered the New Orleans schools desegregated under its own plan of desegregating a year at a time according to a step-ladder program, beginning September 1960. The order reads:

"IT IS ORDERED that beginning with the opening of schools in September 1960, all public schools in the City of New Orleans shall be desegregated in accordance with the following plan:

"A. All children entering the first grade may attend either the formerly all white public school nearest their homes, or the formerly all negro public school nearest their homes, at their option.

"B. Children may be transferred from one school to another, provided such transfers are not based on considerations of race."

July 29, 1960, the State of Louisiana, through its Attorney General, obtained an injunction in the state courts restraining the Board from desegregating public schools in New Orleans. August 17, the Governor of Louisiana, acting under a 1960 law, took over control of public schools in New Orleans. August 27, 1960, a three-judge district court struck down these actions, declared unconstitutional seven Louisiana segregation laws, ordered the Orleans Parish School Board

1. The City of New Orleans is coterminous with the Parish of Orleans.

2. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L. Ed. 1083.

3. D.C., 138 F.Supp. 337, 342. The School Board appealed. This Court affirmed the judgment. 5 Cir., 242 F.2d 156 (1957), cert. den'd 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436. A later motion to vacate the preliminary injunction was denied by the trial court, and on appeal that or-

der was affirmed. 5 Cir., 252 F.2d 253 (1958), cert. den'd 356 U.S. 969, 78 S.Ct. 1008, 2 L.Ed.2d 1074. The Board again moved to vacate the injunction in 1958. This motion was denied and the injunction made permanent. D.C., 163 F.Supp. 701, aff'd 5 Cir., 268 F.2d 78 (1959).

4. The Board filed a notice of appeal, and unsuccessfully sought stays of this order from this Court and the Supreme Court. The appeal remained on the docket until March 1962, when it was dismissed for want of prosecution.

to comply with the order to desegregate, and restrained the Governor and any other state official from interfering with the operation of public schools in New Orleans.[5] August 29 the Board conferred with the district judge to whom the case had been assigned and informed him that the Board, no longer pinned down by restrictive statutes, was at last able to comply fully with his order. The Board asked for a short stay. The district judge postponed the commencement of the Plan to November 14, 1960. In this order he observed that:

"* * * the Court [was] impressed with the sincerity and good faith of the board, each member of which personally appeared, with the exception of member, Emile A. Wagner, Jr., who was absent from the city at the time * * *"

In public session the Board adopted the grade-a-year Plan and announced its intention to comply with the court's orders.

The Louisiana legislature did not remain idle. The Governor of the State called five consecutive extra sessions of the legislature (unprecedented in Louisiana) for the purpose of preventing the Board from proceeding with the desegregation program. Among other actions, the legislature seized the funds of the Orleans Parish School Board, forbade banks to lend money to the Board, removed as fiscal agent for the state the Bank which had honored payroll checks issued by the School Board, ordered a school holiday on November 14, addressed out of office four of the five members of the Board, later repealed the Act creating the Board, then on two occasions created a new School Board for Orleans Parish, still later addressed out of office the Superintendent of Schools in Orleans Parish, and dismissed the Board's at-torney. The federal courts declared these and a large bundle of related acts unconstitutional.[6]

One hundred and thirty-four Negro children applied for admission to "white" public schools in New Orleans. November 14, 1960, four little Negro girls were admitted to two white schools. Small as this may seem in terms of effective desegregation, this was the first time since the founding of the public school system in New Orleans in 1877 that Negro children have attended classes with white children. The effect of this profound change in social customs produced demonstrations, picketing, stone-throwing, and turmoil that continued for months; all white parents withdrew their children from one of the schools and all but a handful of parents withdrew their children from the other school. These are facts of life difficult for the ordinary layman to ignore, notwithstanding the instructions in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, that community hostility to desegregation cannot be considered as a factor in determining what constitutes "deliberate speed". Nevertheless, the Board stood steadfast. The school year ended much more quietly than it began.

In September 1961 eight Negro children, chosen from 66 applicants, were admitted to four schools formerly considered "white" schools, making a total of twelve Negro children in the first and second grades in six white schools. There were comparatively no disturbances at the desegregated schools during the 1961–62 school year.

On February 14, 1962, 101 additional Negro pupils moved to intervene and for a preliminary injunction. They alleged that the pupil assignment procedures denied Negro pupils in the first grade

5. 187 F.Supp. 42 (1960), aff'd 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806.

6. D.C., 188 F.Supp. 916, stay denied 364 U.S. 500, 81 S.Ct. 260, 5 L.Ed.2d 245, aff'd 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806; D.C., 191 F.Supp. 871, aff'd 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1249;

D.C., 194 F.Supp. 182, aff'd 368 U.S. 11, 82 S.Ct. 119, 7 L.Ed.2d 75. In addition, the Attorney General of Louisiana sought a stay of the May 16 order on the ground that it was impossible to carry out. The stay was denied. 364 U.S. 803, 81 S.Ct. 28, 5 L.Ed.2d 36.

the right to attend non-segregated schools "at their option", as provided in the 1960 Plan. The complaint also alleged that pupil placement procedures operated to limit desegregation to a few pupils, while maintaining the established segregation pattern, and that the Negro schools were overcrowded. (There are 37,845 white students in 64 schools and 55,820 Negro students in 53 schools in Orleans Parish.) After a full hearing, March 5, the district court filed an opinion, April 3, D.C., 204 F.Supp. 568, holding that the Board had not complied with the May 16, 1960, order; that the Board continued to maintain a dual system and used pupil placement procedures discriminatorily. The court ruled:

"An analysis of the test program demonstrates that the Board, instead of allowing children entering the first grade to make an election as to the schools they would attend, assigned all children to the racially segregated schools in their residential areas. Then, after being so assigned, each child wishing to exercise his right to elect pursuant to the court's plan of desegregation was subjected to the testing program. No children other than first grade were required to take the tests. * * * This failure to test all pupils is the constitutional vice in the Board's testing program. However valid a pupil placement act may be on its face, it may not be selectively applied. Moreover, where a school system is segregated, there is no constitutional basis whatever for using a pupil placement law. A pupil placement law may only be validly applied in an integrated school system, and then only where no consideration is based on race."

In line with this ruling, April 9 the Court entered a temporary injunction forbidding the Board to apply the Louisiana Pupil Placement Act to any pupil as long as the Board operates a dual school system based on racial segregation.[7]

In addition, the district court found: "The evidence shows that 5,540 Negro elementary school children are on platoon, but no white. The evidence shows further that the average class size in the Negro elementary schools is 38.3 pupils compared to 28.7 in the white, that the pupil-teacher ratio in the elementary schools is 36.0 to 1 for Negro, 26.1 to 1 for white, and that Negro classes are conducted in classrooms converted from stages, custodians' quarters, libraries and teachers' lounge rooms, while similar classroom conditions do not exist in the white schools." Because of *this* finding, the court in its April 9 order accelerated the stepladder program by three grades. Under the April 9 decree, commencing in September 1962, all children entering grades one through six were given the option to attend the public school nearest their homes, whether the school was formerly all-white or all-negro. The basis

7. The April 9, 1962 order reads:
"IT IS FURTHER ORDERED that the Orleans Parish School Board, its agents, representatives, attorneys, and all other persons who are acting or may act in concert with them, be and they are hereby restrained, enjoined and prohibited from assigning pupils in any manner inconsistent with the following plan:
"(A) Beginning with the opening of school in September, 1962, all children entering, or presently enrolled in, the public elementary schools of New Orleans, grades 1 through 6, may attend either the formerly all white public schools nearest their homes or the formerly all Negro public schools nearest their homes, at their option.

"(B) Children may be transferred from one school to another, provided such transfers are not based on considerations of race.
"(C) As long as the defendant, Orleans Parish School Board, operates a dual school system based on racial segregation, the Louisiana Pupil Placement Act shall not be applied to any pupil."
"1 This means that each child entering or attending grades 1 through 6 may elect to go to either the white school in his or her residence district or the negro school in his or her residence district as shown on the defendant's maps of the city of New Orleans outlining the school districts for each race."

for the cut-off at the sixth grade was evidence showing platooning in Negro schools through the first six grades. As everyone well understood, the order amounted to effectively desegregating the first *six* grades since there had been so little desegregation in the first and second grades during the two years the 1960 Plan was in effect.

April 17, 1962, the School Board moved for a new trial on the grounds that the district court erred (1) in ordering the first six grades desegregated and (2) in holding that the Louisiana Pupil Placement Law may be applied only where dual school systems based on race have been eliminated.

The district judge to whom the New Orleans School Case fell by chance in 1952 was Judge J. Skelly Wright, an able, courageous, and patient judge. Ten years later, in the middle of April, 1962, Judge Wright was sworn in as a member of the Court of Appeals for the District of Columbia. Shortly thereafter Judge Frank B. Ellis succeeded Judge Wright.

May 1, the district court stayed the April 9 order and granted a new trial under Rule 59, Fed.R.Civ.P., 28 U.S.C. A., but decided that no new testimony need be heard. May 29, 1962, Judge Ellis readopted the year by year plan, commencing with the first grade in September 1962, and modified the expanded order of April 9 in several important respects. The order of May 29 reads:

"It is therefore the order of this Court that the order of April 9, 1962, be and the same is hereby modified as follows:

"1) The order to desegregate the first six grades by September 1, 1962, is WITHDRAWN.

"2) Beginning with the opening of school in 1962, every child in the City of New Orleans entering the first grade may attend the formerly all-white or formerly all-negro school nearest his home, at his option.

"3) Each year, beginning with the opening of school in 1963, the children in one additional higher grade beginning with the second grade may attend the formerly all-white or formerly all-negro school nearest his home, at his option.

"4) Children may be transferred from one school to another provided such transfers are not based on consideration of race.

"5) Beginning in September of 1963 the dual system of separate geographical districts in the 1st and 2nd grades shall be abolished, and each year thereafter as each succeeding higher grade is integrated the dual system shall be abolished contemporaneously therewith.

"6) The Louisiana Pupil Placement Law may be applied to any child only where dual school systems based on race have been eliminated and assignments are made without regard to race."

The School Board appeals from this order on the ground that the district court erred in ruling that the "Pupil Placement Law may be applied to any child only where dual school systems based on race have been eliminated." The Board does not take the position that it may permanently maintain a dual school system and apply the Act; the Board contends that during a period of transition to a racially non-discriminatory system, it may use the Act.[8] The

8. A resolution of the Board, adopted May 14, 1962, which the district court characterized as "the first affirmative compliance with Brown", states the position of the Board:
"NOW THEREFORE, BE IT RESOLVED by the Orleans Parish School Board, that:
"1. Having made a prompt and reasonable start to fully comply with the

order of the United States District Court for the Eastern District of Louisiana, to desegregate the public schools of this Parish with all deliberate speed, the Orleans Parish School Board does adopt the following plan for the school year 1962–63:
"A. All children entering the ·first grade may attend either the school assigned for the white elementary district

plaintiffs appeal on the ground that the district court erred in requiring desegregation only at the first grade level in September 1962 and in providing for desegregation of the other grades on a step-by-step plan.

## II.

The area of agreement between the orders of April 9 and May 29 and their supporting opinions is larger and more significant than the area of disagreement. In the supporting opinions the two district judges agreed on the basic aspects of the problem:

(1) the Orleans Parish School Board had never submitted a plan itself and had not complied with the 1960 Plan for desegregating public schools in New Orleans;

(2) the technique for maintaining segregation was the unconstitutional, discriminatory application of the Louisiana School Placement Act to Negroes only;

(3) the effectiveness of the Act as a technique for maintaining segregation depended on the continued use of a dual or biracial system of school districts.

There is considerable agreement on the solution of the problem. Both district judges accept the principle set forth in the original 1960 order: effective desegregation requires that when the first grade is desegregated children entering that grade shall have an option to attend the school nearest their homes, whether in any case the school was formerly an all-white or all-negro school. Both agree that this must be accomplished without prior assignment of children to segregated schools. The order of April 9 accomplishes this by providing:

"(C) As long as the defendant, Orleans Parish School Board, operates a dual school system based on racial segregation, the Louisiana Pupil Placement Act shall not be applied to any pupil."

Somewhat more drastically, the order of May 29 similarly provides:

"5) Beginning in September of 1963 the dual system of separate geographical districts in the 1st and 2nd grades shall be abolished, and each year thereafter as each succeeding higher grade is integrated the dual system shall be abolished contemporaneously therewith.

"6) The Louisiana Pupil Placement Law may be applied to any child only where dual school systems based on race have been eliminated and assignments are made without regard to race."

The April 9 order does not in terms abolish the dual system, but it forbids the Board to use the Pupil Placement Act as long as the Board operates the dual system. The May 29 order allows a year

of his or her residence or the school assigned for the negro elementary district of his or her residence, as said districts have been established by this Board, at their option.

"B. Children may be transferred from one school to another, provided such transfers are not based on considerations of race.

"2. The aforesaid plan is not to be construed as a permanent plan to desegregate the public schools of this Parish, but rather is intended solely as a plan for use during the transitional period necessary for solving varied local problems, the solution of which will require additional time and study.

"3. The Superintendent of Schools is directed to establish dates for the orderly registration of all children desiring to enroll in the first grade of the public schools of this Parish, which said registration date shall be no later than June 6, 1962, and to give full and complete public notice of said registration plan, so that the parents of all of said children will be able to exercise a real and conscious option as to the school they wish their children to attend during the school year, 1962–63.

"4. The Superintendent of Schools is further directed to present to this Board the results of the aforesaid registration within 15 days after the completion thereof; and within 30 days thereafter to present to this board, his recommendations for administrative procedures to be used, in implementing the provisions of the plan set forth in this resolution."

for planning but picks up this year by requiring the abolition of the dual system for the first and second grades in September 1963. This order affirmatively allows the Board to use the Pupil Placement Act only where the dual system is eliminated. Both orders are ambiguous in that it is not clear whether the Act may be applied in any grade, as long as there are segregated grades controlled by the dual district system. The intention of the Court may have been to prohibit the application of the Act to segregated grades.

The essential difference between the two orders is that the order of April 9 establishes the option for the first six grades while the order of May 29 reestablishes the option for the first grade, commencing with the opening of school in September 1962. Important as this difference is to New Orleans, we regard as more important the constitutionality of the Board's application of the Pupil Placement Act within the framework of the dual system of racial zones.

### III.

A. Recently, in Augustus v. Board of Public Instruction of Escambia County, 5 Cir., 1962, 306 F.2d 862, 869, Judge Rives commented, "Unfortunately * * * the appellee Board, like so many others, administered the pupil assignment law in a manner to maintain complete segregation in fact." Here, too, we are compelled to say that the Orleans Parish School Board maintained virtually complete segregation in fact.

The 1960 Plan gave each child an unrestricted option to attend the school nearest his home, whether it was formerly an all-white or an all-negro school. But the Board did not allow the children to exercise this option on entering the first grade. Instead, the Board assigned all children to racially segregated schools in their residential area as determined according to the Board's maps of separate Negro and white school districts for New Orleans. The Board then used the placement tests only for applications for transfer. The 130 Negro children who failed their first grade tests in 1960 stayed where they were assigned; no white children were given any tests as a prerequisite to entering the first grade in white schools.

The evidence fully supports the findings of the district court. Judge Wright found:

"To assign children to a segregated school system and then require them to pass muster under a pupil placement law is discrimination in its rawest form."

Even more strongly, Judge Ellis found:

"In New Orleans the statute was used solely for transfer, rather than *assignment* and transfer as required by the statute. The statute was applied solely to negroes and in the context of a bi-racial system. It goes without saying that although '(the) School Placement Law furnishes the legal machinery for an orderly administration of the public schools in a constitutional manner,' * * * '(the) obligation to disestablish imposed segregation is not met by applying placement or assignment standards, educational theories or other criteria so as to produce the result of leaving the previous racial situation existing as it was before.' If pupil assignment cannot be made on the basis of race, it irresistably follows that the prerequisite to assignment may not be applied along racial lines. It does no good to say that the Pupil Placement Law is applied solely to transferees without regard to race when the procedure is so devised that the transferees are always negroes. * * * This Court cannot countenance the present application of the Louisiana Pupil Placement Law in the present status of the Orleans Parish Schools. To believe that desegregation can be effected here with all deliberate speed through application of the Pupil Placement Law is indeed no more than 'a speculative possibility wrapped in dissuasive qualifications.'

However, if dual school systems are eliminated and the Pupil Placement Law is administered even-handedly without overtones of race, the constitutional inhibition is alleviated. Once a child is given the opportunity to choose a school on a non-racial basis, he may be segregated according to academic ability. The mechanics of the plan to be constitutionally applied by the Board would also necessitate a dissolution of the dual schools system."

■ The School Board insists that the plan *was* applied to both white and Negro children. This is no doubt true—with respect to all Negro children applying for transfer to Negro schools and all white children applying to white schools. This is a proper constitutional use of the Act. But when, purportedly as a vehicle for desegregating, the Board applied the Act to Negro first graders only after they had already been assigned to segregated schools in a dual school system, the Board used the Act discriminatorily.

■ In this aspect of pupil assignment the facts present a clear case where there is not only deprivation of the rights of the individuals directly concerned but deprivation of the rights of Negro school children as a class. As a class, and irrespective of any individual's right to be admitted on a non-racial basis to a particular school, Negro children in the public schools have a constitutional right to have the public school system administered free from an administrative policy of segregation. Geographical districts based on race are a parish-wide system of unconstitutional classification. Of course, it is undoubtedly true that Brown v. Board of Education dealt with only an individual child's right to be admitted to a particular school on a non-racial basis. And it is also true, as the second Brown opinion pointed out, that courts must bear in mind the "personal interest" of the plaintiffs. In this sense, the Brown cases held that the law requires non-discrimination as to the individual, not integration. But when a statute has a state-wide discriminatory effect or when a School Board maintains a parish-wide discriminatory policy or system, the discrimination is against Negroes as a class. Here, for example, it is the Orleans Parish dual system of segregated school districts, affecting all school children in the Parish by race, that, first, was a discriminatory classification and, second, established the predicate making it possible for the Pupil Placement Act to fulfill its behind-the-face function of preserving segregation.

We affirm the holding of the district court that the Orleans Parish School Board applied the Louisiana Pupil Placement Act unconstitutionally.

B. A number of cases have severely restricted the use of Pupil Placement Laws. In a recent case the Sixth Circuit ruled: "Since [Brown v. Board of Education] there cannot be 'Negro' schools and 'white' schools. There can now be only schools, requirements for admission to which must be on an equal basis without regard to race. * * * The admission of thirteen Negro pupils, after a scholastic test [which the white children did not have to take], out of thirty-eight who made application for transfer, is not desegregation, nor is it the institution of a plan for non-racial organization of the Memphis school system." Northcross v. Board of Education of City of Memphis, 6 Cir., 1962, 302 F.2d 818, 819.

■ This Court, like both Judge Wright and Judge Ellis, condemns the Pupil Placement Act when, with a fanfare of trumpets, it is hailed as the instrument for carrying out a desegregation plan while all the time the entire public knows that in fact it is being used to maintain segregation by allowing a little token desegregation. When the Act is appropriately applied, to individuals as individuals, regardless of race, it has no necessary relation to desegregation at all. The Act recognizes the power of discretion in a School Board that inheres without benefit of the statute. The Act establishes, for the transfer of students, criteria which in many instances are so obvious as to be unnecessary (an intelligence test, for

example) and in other instances are vague, conflicting, and administratively infeasible. Putting to one side the potentialities of the Pupil Placement Act as an element in the technique of maintaining segregation, the statute is an unusual experiment in education. By means of the Act student bodies can be so controlled that substantially all of the students in any one or more of the schools will be on the same intellectual and cultural level and have the same social background. The wisdom of this policy is not for the courts. It is especially not the business of federal courts how a state operates its schools or experiments with educational theories: as long as the state and its agents do not violate the Constitution. The Orleans Parish School Board may interpret the Placement Act as it pleases and apply it as and when it pleases—as long as placements under the Act are made without racial discrimination.

*This is to say that the New Orleans School Board may not use the Act in the future as it has used it in the past.* The Act is not an adequate transitionary substitute in keeping with the gradualism implicit in the "deliberate speed" concept. It is not a plan for desegregation at all.[9]

■■ There are legitimate uses of the Act. Here is one important example. Under the 1960 Plan the Board, correctly we think, interpreted the Plan as applicable only to the first grade; the Negro children attending white schools were to be the apex of a widening triangle. There is a sound educator's reason for such a plan: it makes for easier educational adjustments. Had the dual system been done away with in the first

grade the Plan, although initiated six years after Brown and although a twelve year plan, would have been in compliance with the "deliberate speed" concept established by the Supreme Court. This conclusion seems implicit in the order of the district court in May 1960. But when the dual system was continued and the Pupil Placement Act applied only after first graders were assigned to segregated schools, it became apparent that desegregation in New Orleans would be a pencil point, not a widening triangle. The transfer of twelve Negro children to white schools over a two-year period is not the institution of a gradual plan for a non-racial school system. It is not even a good start. The children entering the second and third grades in 1962–63 have not had the option supposedly given them in the 1960 Plan. At this late date in the year, however, a large number of lateral transfers from the second and third grades commencing in September 1962 would create serious administrative difficulties. Therefore, in order to bring these grades within the scope of the 1960 Plan, *as nearly as is now feasible,* we modify the May 29 order so that children attending the second and third grades in 1962–63 will be given the limited right to transfer to the school nearest their home under a good faith, non-discriminatory application of the Pupil Placement Act to such transfers.

■ There are other possibilities for a good faith use of the Act during the transition to full desegregation. The Orleans Parish School Board operates one of the finest schools in the country for superior students, Benjamin Franklin High School. To be admitted, students must meet exceptionally high in-

9. In Gibson v. Board of Public Instruction, 5 Cir., 1959, 272 F.2d 763, this Court said: " * * * we cannot agree with the district court that the Pupil Assignment Law or even that the Pupil Assignment Law plus the Implementing Resolution, in and of themselves, met the requirements of a plan of desegregation of the schools or constituted a 'reasonable start toward full compliance' with the Supreme Court's May 17, 1954, ruling. That law and resolution do no more than furnish the legal machinery under which compliance may be started and effectuated. Indeed, there is nothing in either the Pupil Assignment Law or the Implementing Resolution clearly inconsistent wtih a continuing policy of compulsory racial segregation."

tellectual standards. School adjustments between Negro and white students meeting on the same intellectual plane should not be difficult. And, eight years after Brown v. Board of Education is not too soon for a qualified Negro to be admitted to Benjamin Franklin High School. We suggest that the Board consider opening all four high-school grades at this school to Negroes who can meet the school's exacting requirements. Here, too, although the dual or biracial system now controls the high schools, would be a proper place for the good faith, non-discriminatory use of the Pupil Placement Act.

Again, the time will come when desegregation may necessitate transfers from overcrowded to undercrowded schools. In such cases, the Pupil Placement Act may be a useful tool, if it is accompanied by a good faith avoidance of resegregation.

There are doubtless other situations in which effective grade by grade desegregation may be accomplished along with the good faith use of the law providing for the assignment of a pupil to a particular school. At this stage in making the difficult adjustment to a non-racial school system it is too early to throw the Pupil Placement Act overboard. In New Orleans and elsewhere the problems are so varied, the administrative difficulties so numerous, the possible solutions so unpredictable that courts are not in a position to bar absolutely the use of the Act by a school board sincerely attempting an orderly transition to full desegregation by a fixed date. To a great extent the gradual abolition of dual districting will render the Act obsolete as an instrument (genuine or false) for desegregation. At this point, it is better to keep desegregation procedures flexible.

We do not overlook the fact that the members of the Orleans Parish School Board have earned a reputation for integrity and strength of character. The district judge who held against them, yet praised their good faith, said in his last opinion in this case: "The School Board here occupies an unenviable position.

Its members, elected to serve without pay, have sought conscientiously, albeit reluctantly, to comply with the law on order of this court. Their reward for this service has been economic reprisal and personal recrimination from many of their constituents who have allowed hate to overcome their better judgment."

When a case involves the administration of a state's schools, as federal judges we try to sit on our hands. But—we must serve notice that the Act is not a desegregation plan and that this Court cannot tolerate discrimination in the name of the Act. The key to the problem is the elimination of dual or biracial school zones. The limiting principle is clear: the Act may not be used discriminatorily. The touchstone is good faith.

## IV.

When we come to the question of accelerating or decelerating the year-by-year plan adopted in 1960, we are struck by the lack of a sound basis for acceleration or deceleration. There was substantially the same evidence of overcrowding in 1960 as in 1962. The most logical decree to have rendered in April or May 1962 would have been an order requiring the Board to bring the school system into compliance with the original plan of the district court which was approved by this Court. Such an order would give the second-graders and third-graders the same option the first-graders have under the May 29 decree. Unfortunately, at this moment in this case there is too large a gap between logic and experience. The experience the Orleans Parish School Board has gone through to bring about the admission of twelve Negro children to white classes is some indication of the problems that would be created if, this late in the year, three grades were ordered completely desegregated. We are talking now about administrative problems, whatever their source, not community hostility to desegregation as such or problems of law and order as such.

██ The 1960 grade-a-year desegregation Plan for New Orleans is similar to the plan today in Atlanta, Houston,

Dallas, and Nashville.[10] It is as sound now as it was in 1960. We modify the May 29 order, therefore, so that, within the bounds of administrative feasibility, the second and third grades will have an additional measure of desegregation, even if they are not on the identical basis as the incoming first grade.[11] This will be accomplished by allowing pupils now enrolled in the second-grade and third-grade in segregated schools to be transferred in the 1962–63 term. In addition and in order to bring about further compliance with the 1960 Plan, we have broadened the base for abolition of dual districts. The May 29 order allows dual districts during the 1962–63 term, but commencing September 1963 does away with the dual system in the first and second grades. That takes care of the first grade for 1962–63 but not the second and third grades which were supposedly desegregated in the 1960 Plan. To do justice to children who are in these grades, without effecting too violent a change administratively, we provide for the additional abolition of the dual systems in the fourth and fifth grades for the 1964–65 term. Thereafter, as in the district court's order, dual districting will be abolished on a grade a year basis.

## V.

This Court approves the district court's orders of May 29 and April 9, 1962, amending and clarifying the desegregation plan of the Orleans Parish School Board set forth in the order of May 16, 1960, except as modified below:

1. Beginning with the opening of school in 1962, every child in the Parish of Orleans entering the first grade shall have the option of attending the formerly all-white or formerly all-Negro school nearest his home.

2. Each year, beginning with the opening of school in 1963, every child in one additional higher grade, beginning with the second grade, may attend the formerly all-white or formerly all-Negro school nearest his home, at his option.

3. Each child enrolled in the second and third grade for the school year 1962–63 may transfer to the formerly all-white or formerly all-Negro school nearest his home, at his option.

4. The Board may transfer children from one school to another provided that the Board does not base such transfers on racial considerations.

5. Negro children who attended formerly all-white schools in 1960–61 and 1961–62 and Negro children who have registered for attendance at formerly all-white schools in 1962–63 and subsequent years may not be transferred or assigned to an all-Negro school against their wishes. If the transfer of white students from such schools would result in resegregation, the Negro children shall be afforded an opportunity to attend a nearby formerly all-white school without being subjected to tests for transfer under the Pupil Placement Act.

6. In September 1963 the dual system of separate geographical districts for the first and second grades

10. The validity of such a plan depends on the circumstances. See Kelley v. Board of Education of City of Nashville, 6 Cir., 1959, 270 F.2d 209, cert. den'd 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 and Evans v. Ennis, 3 Cir., 1960, 281 F.2d 385. In Boson v. Rippy, 5 Cir., 1960, 285 F.2d 43 this Court said: "In so directing, we do not mean to approve the twelve-year, stair-step plan 'insofar as it postpones full integration.' See Evans v. Ennis, 3 Cir., 1960, 281 F.2d 385, 389. The district court has not expressly passed on whether that much delay is necessary, or whether the speed is too deliberate. It retains jurisdiction of the action during the transition. See Kelley v. Board of Education of City of Nashville, supra; Aaron v. Cooper, 8 Cir., 1957, 243 F.2d 361, 364."

11. 8,125 children registered June 4, 5, and 6, for the 1962–63 school session. 233 Negro children registered (applied for admission) to the first grade in 24 white or formerly all-white schools.

shall be abolished. In September 1964 the dual system shall be abolished for the first five grades. Each year thereafter, as each succeeding higher grade is desegregated the dual system shall be abolished contemporaneously therewith. As the dual system is abolished, the Board shall submit to the Court for approval its maps and plans for a single system of geographical school districts.

7. The Louisiana Pupil Placement Act may be applied only when the Board makes placements without regard to race. In such situations the Board will be expected to base its application of the Act on high standards of good faith.

The judgment below is affirmed in part and reversed in part. The case is remanded to the district court for action consistent with this opinion.

### On Petition for Rehearing

The Orleans Parish School Board has filed an application for a rehearing in which it has prayed that this Court's judgment of August 6, 1962 in this cause be set aside or modified in certain respects. The basis for the request for modification rests on the Board's adoption of (1) a Long Range Plan and (2) a Transitionary Plan for the scholastic year 1962-63 for the desegregation of the public schools of New Orleans. Attorneys for the Board submitted the plans to the district court. After a conference with the attorneys for both the appellants and appellees, who were in agreement on the Transitionary Plan, the district court approved the substance of this plan subject to further orders of this Court. The district court also approved the substance of the Long Range Plan. The attorneys for the Negro plaintiffs, the appellants, have neither approved nor disapproved of the Long Range Plan; they request time within which to study the details of this plan.

### I.

The action of the Board in adopting detailed plans for submission to the district court represents a forward step in the proper direction of recognizing local responsibility for preparing desegregation plans and putting such plans into effect. We observe again that desegregation procedures, within reasonable limits, must be flexible in order to fit local needs and new situations as they arise and present problems. Here, as in Augustus v. Board of Public Instruction of Escambia County, 5 Cir., 1962, 306 F.2d 862, we say that the primary responsibility for judicial supervision lies with the district court. It is the tribunal best qualified to wrestle with specifics. "We are reluctant to substitute our judgment for that of the district court * * * *Further amendments to the plan may be suggested by the plaintiffs and will occur to the Board, now acting in good faith, and to the district court, and operation of the plan will be supervised by the district court,* all to the end that complete desegregation of the public schools may be accomplished 'with all deliberate speed.' " In all of the school segregation cases, "the district court will, of course, retain jurisdiction throughout the period of transition. Brown v. Board of Education, 1955, 349 U.S. 294, at 301 75 S.Ct. 753, at 756, 99 L.Ed. 1083." Nevertheless, it is our duty to review the action of the district court and, in the proper case, to modify the orders of that court and of this Court.

### II.

The Long Range Plan is not to take effect until September, 1963. And, the Board's plans for the scholastic year 1963-64 are identical with the orders of the district court and this Court. The suggested modification is not to take effect until September 1964. In the meanwhile, the Board has directed the Superintendent of Schools to prepare, by December 1, 1962, a detailed study of ways and means of abolishing the presently existing bi-racial school zones in the Parish of Orleans. Until the Board and its Spperintendent have had an opportunity to complete such a study, and until there has been a hearing before the district court with full opportunity for

the plaintiffs' attorneys to oppose this Long Range Plan, it is premature for this court to consider the proposal. Accordingly, we take no action on that plan at this time. So that there will be no misunderstanding and no cause for unnecessary delay, we now say to the Board that the mandate of the Court previously issued in this cause does not forbid the preparation and submission to the district court of the Long Range Plan or other plans and recommendations for modifying the presently existing court-approved plan for desegregation of New Orleans Schools.

### III.

The substance of the Transitionary Plan is in accord with the language and spirit of the opinion of this Court of August 6. The attorneys for the appellants approved the proposal, without qualification, and the district court has approved it, subject to orders of this Court.

The primary purpose of the recommended modification of this Court's order is to alleviate overcrowding in Negro schools. This is to be accomplished, in good part, by converting McDonogh 19, Judah P. Benjamin and William O. Rogers schools, into Negro schools. The Board avers that as a result of this conversion, plus the completion of construction projects during 1962-63, approximately 5000 Negro students will be taken off the platoon system. In addition, the size of classes in eighteen Negro schools will be reduced. Any child, without regard to race, who attended McDonogh 19, William O. Rogers, or Judah P. Benjamin Schools in the scholastic year 1961-62 may attend either the white school or the Negro school in his residence district. Negro children who registered at these schools for the year 1962-63 will be within the uni-racial system for the year 1963-64.

 In view of the agreement by the parties and the approval of the district court of the Board's Transitionary Plan, paragraph five of the order of this Court of August 6, 1962, is herewith modified to permit the Orleans Parish School Board to make such changes in the administration of McDonogh 19, William O. Rogers, and Judah P. Benjamin schools as will be necessary or proper in order to carry out the provisions of its Transitionary Plan.

The petition of the Orleans Parish School Board is herewith granted in part and denied in part. It is ordered that the mandate be issued forthwith in accordance with this opinion and judgment of the Court.