WIENER, Circuit Judge,
dissenting:
The brooding omnipresence that over-arches the panel majority’s reversal of the district court is the unarticulated premise — fatally flawed, I submit — that the trial court’s partial release of the consent decree vis-a-vis Caddo Magnet School, ipso *263 facto voided the very programs and policies long employed by the school district to achieve that partial release. As I shall explain more fully below, I am compelled, with my utmost respect, to dissent.
If the school board had unilaterally adopted its racial-quota admissions policy for magnet schools anew- — after the Caddo Parish School District had been declared unitary (which it has not) or even after the court had ceased its supervision of the particular magnet school’s student admissions policy under the consent decree (which it has) — I would likely have no concerns about joining the majority’s opinion. But that is not our case and thus not the framework within which we must review it. Rather than a brand-new, post hoc admissions policy, the plan that we must test for constitutionality is (1) a longstanding race-based admissions policy, (2) which has been “on the books” and consistently administered for many years, (3) pursuant to an existing consent decree, (4) as part and parcel of the school board’s comprehensive and continuing efforts, specifically to comply with the district court’s mandate to achieve a 50/50 ratio in the Magnet Schools and generally to eradicate all vestiges of past segregation. When we review the case in this framework — as we must — the school board’s discretionary decision to retain its magnet school admissions policy as an integral tool in the Board’s ongoing struggle to achieve its court-ordered, yet-unrealized goal of total desegregation easily passes our scrutiny.
Cessation of court supervision of the magnet school aspect of the consent decree is not the equivalent of a court declaration that the persistent vestiges of more than a century of school segregation have ceased to plague a substantial majority of Caddo’s minority school students. Although the Supreme Court allows district courts to discontinue supervision over some (but less than all) aspects of plans to achieve unitary status in historically segregated school districts, the Court has never ruled that such a partial release from supervision forecloses a school district’s option to continue using the ensconced race-conscious policies that enabled it to achieve and maintain such status. To the contrary, the Court has consistently emphasized the importance of affording school districts maximum discretion and control over local schools, particularly with respect to remedying the vestiges of past segregation.[1] In fact, it has explicitly endorsed school districts’ use of race-conscious policies.[2]
It is true, as the majority points out, that, as a general rule, Supreme Court precedent requires us to scrutinize race-conscious government policies strictly. Nevertheless, race-based features of school districts’ desegregation plans enacted pursuant to court order, such as the one here at issue, are afforded a special presumption that they address a compelling state interest — remedying the effects of past segregation — over and above the general deference that we accord local school districts’ efforts to comply with each aspect of court-ordered desegregation plans. Here, the 1990 consent decree expressly released Caddo Middle Magnet School (“Caddo Magnet”) from further court su *264 pervision. To this day, however, the school district as a whole remains bound under the consent decree, and the Board risks court sanctions if it does not make bona fide efforts to fulfill all its obligations under the order. If, therefore, we were to prohibit the Board’s continued use of those race-conscious policies that have long been in place, and at the same time were to threaten sanctions if the board does not continue its efforts to remedy the effects of past racial discrimination, we would be putting the Board in a classic “Catch-22” situation. In consequence, our review of the Caddo Magnet admissions policy must take into account the timing and history of that policy and the circumstances under which the school district operates — and defer to local authority to the maximum extent of our authority.

Partial Unitary Status

The panel majority cites no Supreme Court pronouncements, (and I have found none) on the effect that a district court’s declaring a school district “partially unitary” has on a school board’s continued use of policies validly enacted and continually applied in compliance with a consent decree. Despite the majority’s reliance on Freeman v. Pitts, that case addresses the equitable power of district courts to supervise continuing desegregation efforts, not the discretion of school boards to decide how to implement these efforts. The Freeman Court permitted district courts to relinquish control over local school districts gradually by declaring them unitary in increments, i.e., to release districts from the obligation to continue some discrete desegregation policies while continuing to address remaining vestiges of discrimination in other areas.[3] Significantly, this decision did nothing to diminish either the discretion of school districts to continue programs previously enacted pursuant to a consent decree or the deference we must afford to the districts’ exercise of that discretion.[4] In fact, when the Court has taken up the issue of school board discretion to consider race in implementing a desegregation policy, it has acknowledged that board discretion to implement such policies exceeds the equitable power of the courts to order them to do so.

School Board Discretion and the Use of Race

The Supreme Court’s 1971 Swann decision highlighted the expansive discretionary power of • school officials to remedy past segregation and contrasted it with the equitable powers of the courts:
School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.[5]
*265 In this decision and others, the Court endorsed local discretion to use racial balancing as a means of correcting inequities caused by de jure segregation, and it has never reversed itself on this issue.[6] In Washington v. Seattle School District No. 1, the Court struck down a citizen initiative enacted to prevent local school districts from implementing race-based student assignments to achieve formal racial balance goals.[7] The Court held that the citizen initiative violated the Equal Protection Clause because it forbade busing only for the purpose of achieving racial balancing in the schools and added: “It is undeniable that busing for integration — -particularly when ordered by a federal court — now engenders considerable] ... controversy ... But in the absence of a constitutional violation, the desirability and efficacy of school desegregation are matters to be resolved through the political process.”[8] In fact, the Seattle School District decision, along with then-justice Rehnquist’s decision in Bustop, Inc. v. Board of Education of City of Los Angeles, upheld state decisions to assign students based on race despite the absence of any court order requiring the district to integrate its schools, i.e., as a discretionary remedy for past segregation.[9]
In addition, the Court has repeatedly stressed the importance of local control over schools. The Freeman Court explained that courts should withdraw supervision of school districts as quickly as possible because “local autonomy of school *266 districts is a vital national tradition.”[10] Courts have likewise emphasized the importance of maximum local responsibility for crafting integration strategies.[11] As noted above, the Swann Court expressly approved a school district’s discretion to use a prescribed racial ratio to this end, even though it expressed doubt whether a federal court could order the district to do the same.[12]

Strict Scrutiny

Certainly, the Court’s more recent Cro-son and Grutter decisions have clarified our duty to scrutinize government use of racial classifications strictly for both a compelling state interest and narrowly tailored means to achieve the goal of such classification.[13] I am convinced that, under the instant circumstances, the Caddo Magnet policy satisfied both at the time of its promulgation; and more to the point, does nothing to require us to test the continued employment of that policy, post-supervision, under the strict scrutiny rubric.
A. Compelling State Interest
It is well established that remedying the present effects of past discrimination is a compelling state interest.[14] As the panel majority notes, Caddo Parish School District has been previously adjudged dual, i.e., guilty of discrimination. The continued existence of a consent decree imposed pursuant to a judicial finding of past de jure segregation, even if now only partially enforceable, is nonetheless prima facie evidence of the continued existence of the effects of past discrimination. This is so for several reasons, even with respect to a consent decree that remains only partially in effect.
First, a formerly dual school district is under a continuing duty to “take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.”[15] Persons subject to such an in-junctive decree of a court of competent jurisdiction are expected to obey that order until it is modified or reversed.[16] This holds true even if the order compels violation of another statute — or the Constitution for that matter.[17] Declaration of *267 partial unitary status cannot be read to modify, much less repeal, the substantive elements of the order such that the school district is no longer required to take all efforts to comply with it, even if those efforts might otherwise violate the law.
Second, school districts under court order to remedy past segregation should not first be forced to consider race and undertake race-conscious policies to the point of achieving partial unitary status, only to be forced at that time either to abandon these policies immediately or to conduct extensive studies to prove a direct correlation between the policy and some aspect of their violation despite potential liability for their remaining obligations. The Supreme Court has observed that the indicia by which school districts are adjudged dual or unitary, such as one-race schools, segregated facilities, faculties, or student bodies, and the like, may be intertwined in such a way as to make the remedy for one effect of the constitutional violation effective to remedy other inequities.[18] Many school districts undoubtedly do not have the resources to produce direct evidence of the causes and effects of these interconnected factors, yet they could be sanctioned for failing to satisfy their obligations under such decrees.[19] For these reasons, at least until a district is declared fully unitary, we should accept the truism that a consent decree’s requirement that the school district remedy past segregation is sufficient evidence that vestiges of past discrimination persist and, accordingly, that remedying them is a compelling governmental interest.
B. Narrowly Tailored
The Caddo Magnet policy was validly enacted, i.e., narrowly tailored to achieve the goals, of the consent decree, and it continues to meet the narrow tailoring requirement, even under the partial consent decree. Under the circumstances of this case, viz., a school district’s complying with the court’s order to remedy a past constitutional violation by, inter alia, achieving a 50/50 black-white student body in its magnet schools, we should view with considerable deference the continuation of any policy previously enacted and unswervingly administered — under years of court observation — to bring the school district into compliance with the court order.[20]
As recently as 2001, the Fourth Circuit in Belle v. Charlotte-Mecklenburg Board of Education employed a “deferential” brand of strict scrutiny when it held that a similar race-based admissions formula for magnet schools did not violate the Constitution, because it had been implemented pursuant to a consent decree and had been *268 sufficiently narrowly-tailored to fulfill the Board’s court-ordered obligations.[21] The Belk court considered an admissions lottery that allocated spots in a magnet school according to race.[22] The Charlotte-Mecklenburg School district had created separate lotteries for black and non-black students in an effort to achieve racial balance in its magnet schools. First, if a sufficient number of children of either race did not fill the quotas for the children’s respective races, the Board would actively recruit children of the opposite race despite lengthy waiting lists for “majority” race spots.[23] But then, if the Board could not successfully recruit enough children of the targeted race, the remaining open spots usually went unfilled.[24] The Fourth Circuit concluded in two separate opinions that the Board’s policy survived constitutional scrutiny, despite the fact that the relevant court order did not require the school district to use a race-based admissions policy.[25]
Four appellate judges held that the underlying court order’s broad language commanding the district to take “whatever steps might be necessary to convert to a unitary system,” together with the school district’s discretion to maintain control over the racial composition of the schools, justified use of a quota.[26] Chief Judge Wilkinson, along with Judge Niemeyer, expressed strong disapproval of the use of quotas and doubted that the Board’s policy would survive if it were enacted voluntarily, but reasoned that the school district was nevertheless entitled to flexibility in how it complied with a court order:
It is true that in the early 1990’s, the school board in its magnet program eagerly accepted the courts’ invitation to rely upon numerical benchmarks. I believe, however, that it is necessary to afford a school board some latitude in attempting to meet its desegregative obligations if we are not to undermine the rule of law. To do otherwise leaves the Board between a rock and a hard place. Namely, if the school board fails to carry out the court desegregation order, it can be cited for contempt or held not to have achieved unitariness. But if the Board acts aggressively to implement the court order, it risks facing judicial condemnation and the threat of litigation on the grounds that it was acting ultra vires. This is not the kind of quandary into which we should force institutions that are, for better or worse, under judicial decree.[27]
We know that here, as in Belk, the district court’s 1990 consent decree did not *269 mandate the precise quota policy here at issue, but broadly commanded Caddo Parish School Board to make “reasonable efforts” to recruit black students to its magnet schools. In so doing, however, the court did specifically decree that the targeted black-white enrollment ratio for the school should be 50/50, adding that this projected enrollment would be deemed satisfied if actual enrollment at Caddo Magnet was within plus or minus fifteen percentage points of the ratio mandated by the court for that school. Although the consent decree did not explicitly order Caddo Magnet to use a race-conscious quota admissions policy, it is indisputable that, given (1) the court’s constitutional mandate for the Board to take whatever steps were necessary to fulfill its obligations, and (2) the Supreme Court’s prior approval of quite similar race-conscious admissions policies, this was a reasonable and constitutionally-acceptable means for the Board to initiate and continue in its efforts to meet and maintain its court-ordered enrollment goals.[28] Like the Belk policy, the Caddo Magnet policy was validly enacted as a narrowly tailored means of achieving the goals set forth in the consent decree.
Our own precedent supports affirming the district court’s ruling that upholds the continued viability of Caddo’s magnet school admissions policy. Davis v. East Baton Rouge Parish School Board, for example, is apposite.[29] Although, unlike the Caddo board, the Baton Rouge School Board was still under court order with respect to its magnet school admission policy, and although the time frame between the enactment of the decree and our review was narrower, the gravamen of our holding the Baton Rouge magnet schools admissions policy viable was that the quota would prevent the magnet schools from undermining desegregation in the parish as a whole.[30] Surely this rationale applies irrespective of whether all or any part of a school district remains under court order to desegregate — likely even after full unitary status is achieved, but certainly during the continuation of the status quo.
Neither can I agree that Bryant v. Cad-do Parish School Board,[31] our earlier decision affirming the Western District of Louisiana’s upholding of the self-same Caddo Middle Magnet admissions policy, is unpersuasive. Regarding the panel majority’s first concern — that the Bryant district court did not address Freeman — I have already noted that Freeman only spoke to the district court’s authority to relinquish control in an incremental fashion; it said nothing about the effect of partial unitary status on a school district’s power to craft its own policy.[32]
*270 The majority’s second concern — that the consent decree itself contemplated that the magnet schools would be released from the decree after fulfilling their obligations — • also speaks to the discretionary authority of the school district to change the admissions policy when and if it determines that it is proper to do so. It does not speak to any obligation to discontinue the policy, ipso facto, immediately on release from court supervision.
As regards the majority’s third concern, it is true that the stated purpose of creating and operating magnet schools was to enhance the quality of education imparted to qualified students at those schools. We recognized in Davis, however, that a primary purpose of racial quotas for magnet school admissions is to ensure that “voluntary attendance schools not work to undermine the progress of desegregation in the parish.”[33]
As for the majority’s belief that there is no clear relationship between the remaining deficiencies in the Caddo Parish School system and racial balancing at Caddo Magnet, the foregoing quotation from Davis clearly identifies a nexus between admissions policies at magnet schools and enrollment throughout a district. Although the Board no longer remains under court supervision with respect to racial enrollment projections, it does remain under court order with respect to one-race schools and majority-minority transfers. Even if here the Davis nexus is slightly attenuated, it is not unreasonable to deduce that abolishing the magnet school admissions policy would likely “undermine” continuing efforts to remedy the broader problem of one-race schools. Freeman itself acknowledged that racial balancing in student assignments may be a legitimate means to correct inequities elsewhere in a school system that were also caused • by a constitutional violation.[34] Eliminating all vestiges of prior segregation remains a court-ordered goal for the Board.
In the universe of narrow tailoring, magnet schools have been recognized by courts time and again as an effective and unobtrusive means for school districts to remedy vestigial effects of past segregation.[35] Congress itself has extolled the virtues of magnet schools as a means “to continue to desegregate and diversify schools ... recognizing that segregation exists between minority and nonminority students ... [and that] [desegregation efforts through magnet school programs are a significant part of our Nation’s effort to achieve voluntary desegregation ... ” in its Magnet Schools Assistance Program.[36] And, although Caddo Parish’s partial unitary status includes Caddo Middle Magnet, *271 the district as a whole has not been declared unitary as to remaining one-race schools, majority-to-minority transfers, and staffing. Even though Caddo’s magnet schools are no longer compelled to enroll majority and minority students according to the flexible ratio at issue, they were created, and continue to be used, “to enhance the quality of education and bring about a greater degree of desegregation.”[37] The magnet school admissions policy certainly “fits” this goal.

Conclusion

The admissions policy at Caddo Parish was validly enacted to serve a compelling state interest and was narrowly tailored to achieve that interest, pursuant to a valid consent decree. The fact that the district court might no longer threaten the school district with sanctions if the magnet schools do not meet their projected enrollments does not mean that Caddo Parish must immediately scrap the race-based admissions policy for its magnet schools as part of its broader plan to desegregate. The Supreme Court has never spoken to the effect of partial unitary status on existing aspects and policies of the desegregation plan of an extant consent decree, but has emphasized the breadth of school district discretion and the importance of local control over schools. Consequently, our deference to a locally-accountable school board’s decision to continue the use of a race-conscious admissions policy of which the supervising court was obviously aware for as long as it takes to eradicate the vestiges of segregation is legally defensible despite the anathema of racial quotas generally.
Indeed, Supreme Court precedent, such as Seattle School District and Bustop, indicates that the Court views even voluntarily-adopted race-conscious policies with a substantial degree of tolerance. We need not go that far, but neither should we retrench on Court precedent by unduly restricting school districts, especially those that continue to operate under court order. Our review of the instant policy should be considerably more deferential than the strictest of strict scrutiny, keeping in mind that the entire ■ district remains under court order and that partial cessation of court supervision of this facet of magnet school admissions is not the equivalent of terminating the continuing presumption of deference to school boards by the courts.
I end where I began. If this Caddo Magnet racial-quota admissions policy were enacted unilaterally by the Board today, after the court has ceased supervision of the magnet schools, I could go along with the majority’s strict scrutiny analysis and rejection of the quota system. But inasmuch as that policy was enacted pursuant to court order and has been in place for years under that order — with court scrutiny and without court disapproval — and the Board is still hard at the task of eradicating the pernicious effects of de jure segregation, I am convinced that the test employed in the majority’s opinion is inappositely stringent and thus, I respectfully submit, inapplicable in this framework.

. See, e.g., Freeman v. Pitts, 503 U.S. 467, 490, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) (citing Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977)). See also Bush v. Orleans Parish Sch. Bd., 308 F.2d 491, 501 (5th Cir.1962) ("When a case involves the administration of a state's schools, as federal judges, we try to sit on our hands.”)

. See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

. Freeman v. Pitts, 503 U.S. 467, 491-2, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

. See id.

. Swann, 402 U.S. at 16, 91 S.Ct. 1267. The majority refers to this passage as "the purest passing dicta” and states that it forms no link in the chain of reasoning by which the Court arrived at its holding. I do not cite this language as the holding but for the same reason the Supreme Court included it: as an example of the contrasting powers of the courts and of local school districts. For this reason, -I must also take exception to the charge that this language played no role in the reasoning of the Charlotte-Mecklenburg decision. This opinion addressed the equitable power of district, courts to order school *265 districts to institute a variety of programs to address past segregation, and made clear that this equitable power does not reach as far as the inherent power of school authorities. Certainly, language comparing courts’ power to that of school authorities plays a role in the Court’s effort to define the reach of district court's authority. I agree that this language was not central to the North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) decision, and accordingly do not cite that case as an example of the expansive power of school authorities. Despite these observations, — that the quoted language did not figure in the reasoning of the North Carolina decision or the ultimate holding of the Charlotte-Mecldenburg opinion — unlike the majority, I cannot imagine that a unanimous Court would unequivocally state — twice—that school districts have plenary power to institute race-conscious admissions program if it did not mean that school districts have this kind of authority. The language from Washington v. Seattle County Sch. Dist. No. 1., 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) and Bustop, Inc. v. Bd. of Educ. of City of Los Angeles, 439 U.S. 1380, 99 S.Ct. 40, 58 L.Ed.2d 88 (1978), which I have cited below, only reinforces my point that the Supreme Court has repeatedly referred to the expansive power of local school authorities, and that we therefore owe a measure of deference to home-grown, race-conscious admissions plans when enacted pursuant to a consent decree. Inasmuch as the Supreme Court has never stated, even in dicta, what the majority holds, I do not think that this point undermines my analysis of the case.

. See id. See also Freeman, 503 U.S. at 497, 112 S.Ct. 1430 ("Racial balancing in elementary and secondary school assignments may be a legitimate remedial device to correct other fundamental inequities that were themselves caused by the constitutional violation.”).

. 458 U.S. at 471-74, 102 S.Ct. 3187.

. Id. at 473-74, 102 S.Ct. 3187.

. Seattle School Dist., 458 U.S. at 474, 102 S.Ct. 3187 (assuming that school board had the power to order race-based student assignment and busing, even though school system was not under court order to desegregate); Bustop, 439 U.S. at 1383, 99 S.Ct. 40 (upholding California state courts’ desegregation order, including extensive busing and race-based school assignments, as not "required” but certainly "permitted” by the U.S. Constitution). See also Swann, 402 U.S. at 16, 91 S.Ct. 1267 (discussing "traditionally” broad power of school authorities to formulate policies that would not be within the power of a federal court to order).

. Freeman, 503 U.S. at 490, 112 S.Ct. 1430 (citing Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977)). See also Milliken v. Bradley, 418 U.S. 717, 741-42, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974)("No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process.”); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)("This case ... involves the most persistent and difficult questions of educational policy, another area in which this Court’s lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels.”).

. Swann, 402 U.S. at 15, 91 S.Ct. 1267; Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 401 (4th Cir.2001).

. Swann, 402 U.S. at 16, 91 S.Ct. 1267.

. Grutter v. Bollinger, 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

. Dallas Fire Fighters Ass’n v. City of Dallas, 150 F.3d 438, 441 (5th Cir.1998).

. Green v. School Bd. of New Kent County, 391 U.S. 430, 437-38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

. GTE Sylvania, Inc. v. Consumers Union of United States, 445 U.S. 375, 386, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980).

. GTE, 445 U.S. at 378 n. 2, 100 S.Ct. 1194; Walker v. City of Birmingham, 388 U.S. 307, 317, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

. Freeman v. Pitts, 503 U.S. 467, 497, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

. The majority states that it would be "manifestly unfair and illogical” to require the plaintiffs to prove that the Caddo Magnet admissions policy was unjustified more than a decade after the 1990 order. On the contrary, I find it unfair and illogical that any plaintiff seeking admission to a magnet school that has as the very reason for its existence the court-ordered effort to desegregate Caddo Parish Schools, may force the Board to prove, as many times as there are plaintiffs, the justification for its policy while the district as a whole remains subject to court order. The fair thing to do, I believe, is to allow the district the presumption that its policy addresses a compelling state interest, at least until the district as a whole is no longer subject to court order.

.Some deference to the decisions of educational policy-makers, even when the court is strictly scrutinizing voluntarily-e nacted race-conscious policies, is appropriate. See Grutter v. Bollinger, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ("Our holding today is in keeping with our tradition of giving a degree of deference to a university’s academic decisions, within constitutionally-prescribed limits.”).

. Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 354, 401 (4th Cir.2001). The majority takes issue with my reliance on Belk, arguing that this case is inapposite because there was no prior order removing magnet schools from the extant desegregation orders. My reason for relying on Belk, however, is to counter the majority's holding that the Caddo Middle Magnet admissions policy was not narrowly tailored at the time of its promulgation. Other considerations, such as our deference to school board authority, the school board’s continuing duty to comply with its consent decree, and the use of race-conscious admissions policies at magnet schools to prevent them from undermining desegregation in the rest of the district' — considerations to which the majority does not respond — support a holding that the policy continues to be narrowly tailored.

. Belk, 269 F.3d at 316-37.

. Id.

. Id.

. Id. at 311.

. Belk, 269 F.3d at 401 (King, J. and Motz, J., concurring).

. Belk, 269 F.3d at 354. (Wilkinson, C.J., concurring).

. See Green v. County Sch. Bd. of New Kent County, 391 U.S. 430, 437-38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (holding that school boards previously operating state-compelled dual systems were "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system”); NAACP v. Duval County Sch., 273 F.3d 960, 968 (11th Cir.2001)(noting with approval that the school district, "while not contractually obligated to,” capped white enrollment at magnet schools to promote integration).

. 721 F.2d 1425 (5th Cir.1983).

. Id. at 1440. (" 'The First Circuit has specifically approved application of a racial quota in admissions to magnet schools to ensure that they would not serve as a haven for those seeking to attend a school predominantly composed of those of their own race.' We agree.”) (internal citations omitted).

. CV No. 95-0441 (W.D.La. Jan. 3, 1997).

. See infra text accompanying notes 3-4. See also Freeman, 503 U.S. at 489, 112 S.Ct. 1430 ("A federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control.”)

. Davis, 721 F.2d at 1440 (emphasis added).

. Freeman, 503 U.S. at 497, 112 S.Ct. 1430. The Freeman court ultimately found that there had been no showing that racial balancing was an appropriate mechanism to cure other deficiencies in the school system, but it acknowledged that the district court did not make specific findings and conclusions on that issue and remanded for further proceedings. Id. at 498, 112 S.Ct. 1430. Further, the Freeman decision did not implicate the school board's discretion to use racial balancing to cure other deficiencies, but only the equitable power of the district court to order the Board to do so. See id. Finally, the issue in Freeman was whether race-based student assignments could remedy problems with faculty assignments, whereas Caddo Parish has not achieved unitary status in two other areas, including one-race schools and majority-to-minority transfers. Id.

. See Milliken v. Bradley, 433 U.S. 267, 272, 287-88, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); Belle, 269 F.3d at 355 (Wilkinson, C.J., concurring) ("Magnet schools are a widely used desegregation device.”).

. 20 U.S.C. § 7231 (2002).

. 1981 Caddo Parish Consent Decree.